# IN THE SUPREME COURT, STATE OF WYOMING

## 2017 WY 14

OCTOBER TERM, A.D. 2016

*February 9, 2017*

JEREMIAH ETHAN SAMUEL SHULL,

Appellant
(Defendant),

v.

S-16-0046

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Fremont County*
*The Honorable Norman E. Young, Judge*

*Representing Appellant:*
    Thomas B. Jubin of Jubin & Zerga, LLC, Cheyenne, Wyoming

*Representing Appellee:*
    Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Philip M. Donoho, Assistant Attorney General.  Argument by Mr. Donoho.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, Justice.

[¶1]    Appellant Jeremiah Shull used a knife to kill a man he found in bed with his wife, and a jury convicted him of first degree murder.  We reverse and remand for a new trial due to instructional error.

## ISSUES

[¶2]    Shull raises four issues, all of which relate to his position at trial that the killing was not premeditated murder, but rather the lesser included offense of voluntary manslaughter.[1]  We rearrange and, for the sake of clarity, slightly reword those issues as follows:

I.      Did the jury instructions create reversible error as to the lesser included offense of voluntary manslaughter because they instructed the jury that the State had to prove beyond a reasonable doubt that Shull acted in a sudden heat of passion, rather than that it had to prove that he did not act in a sudden heat of passion beyond a reasonable doubt?

II.     Did the prosecutor's objection and the district court's ruling on a portion of Shull's closing argument, and the prosecutor's subsequent rebuttal argument, improperly advise the jury that if it found Shull intended to kill, it could not find that he committed voluntary manslaughter?

III.    Did an instruction defining the term "malice" for purposes of first-degree murder create reversible error by virtue of its failure to convey that a malicious act had to be one performed with "hatred, ill will, or hostility?"

IV.     Did the district court err by allowing the introduction of a portion of a recorded telephone call to police in which the caller, Shull's father, predicted Shull's intentions based on a conversation the two had?

## FACTS

[¶3]    This case presents facts from which both parties argued inferences as to whether Shull was guilty of first degree murder, second degree murder, or manslaughter.  We will

---

[1] Wyo. Stat. Ann. § 6-2-101(a) (LexisNexis 2015) provides in pertinent part that "[w]hoever purposely and with premeditated malice . . . kills any human being is guilty of murder in the first degree."  Wyo. Stat. Ann. § 6-2-104 (LexisNexis 2015) provides that "[e]xcept as provided in § 6-2-109 [dealing with homicide of a pregnant woman], whoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree . . . ."  Wyo. Stat. Ann. § 6-2-105(a)(i)(LexisNexis 2015) provides that a person is guilty of manslaughter if he "unlawfully kills any human being without malice, express or implied, . . . [v]oluntarily, upon a sudden heat of passion[.]"

1

therefore summarize the pertinent evidence to demonstrate the competing versions the jury had to sort out.

[¶4]    Shull and his wife, Julie Cordell-Shull (Cordell),[2] wed in February of 2014 after dating for approximately one month.  They lived in Shull's house in Riverton, Wyoming for about three tempestuous months, until he was arrested on a charge unrelated to their relationship.  At that point, Cordell moved to Denver with an ex-boyfriend.  In late July of 2014, she returned to Wyoming and began living with her friend Jennifer Gamble and Gamble's children and boyfriend in a home located five to seven miles north of Riverton.

[¶5]    The two reunited when Shull attended a party at that home in early August and then moved in there with Cordell for a little more than two months, returning to his own house only to retrieve clothes and various other belongings.  However, their relationship again became volatile and argumentative, and on October 15, 2014, Cordell and Gamble insisted that Shull move out of the home.  Around this time, Cordell let Shull know that she was seeing another man.

[¶6]    Two days after Shull moved out, while Cordell was at Shull's house to get cigarettes, she received a phone call or a text message from that other man, Jake Willenbrecht.  Shull therefore took her cell phone and smashed it.  They had another confrontation the next day, Saturday, October 18, at Gamble's home.  Cordell arrived with Willenbrecht in her vehicle shortly after Gamble took Shull to the house to pick up some belongings left behind when he moved.[3]  Shull tried to make up with Cordell, but the couple soon began to argue loudly in the driveway.  Cordell told Shull that she wanted a divorce and did not want to be with him.

[¶7]    Finally, Gamble put an end to the altercation.  But Shull wasn't done, and he went to the vehicle where Willenbrecht was sitting and told him that he didn't want to see him again.  Shull also told Willenbrecht that the only reason he did not fight him on the spot was out of respect for their presence at the Gamble residence.  Although all participants soon went their own ways, Shull was left visibly distraught almost to the point of physical illness by the encounter, according to Gamble.

[¶8]    Later that evening, Cordell and Willenbrecht went to a bar for a time, and then returned to Gamble's house, stopping along the way at Shull's home so she could take his iPad, without his permission, to serve as a substitute for her broken cell phone until she could replace it.  The evidence indicated that Shull was quite attached to the iPad, and used it to watch movies, etc.  Cordell and Willenbrecht drank for a while longer after reaching Gamble's place, and Willenbrecht, who was hesitant to drive home after

---

[2] Cordell-Shull and the Appellant were still married at the time of trial, but she asked to be referred to as Cordell.  We will honor that request.

[3] Shull's vehicle, a Jeep, was inoperable at the time of the events described in this opinion.

2

drinking, went to sleep in Cordell's bed around midnight.  She stayed up for another three hours and finally retired in the same bed between 3:30 and 4:00 a.m. on October 19, 2014.

[¶9]    That same evening, Shull and Thomas Tynsky, an old friend who was living with Shull, planned to watch a movie at Shull's house, but they eventually went drinking for several hours at another friend's home instead.  At one point, another friend overheard him talking with Tynsky about going on "his next mission," and heard Tynsky try to discourage him from whatever he was suggesting.

[¶10]  After getting extremely drunk, Tynksky and Shull returned to Shull's house to watch the movie, but decided to take a walk to take Shull's mind off his earlier encounter with his wife and Willenbrecht.  Tynsky lasted about a block and a half before he got cold and headed back to the house.  Shull continued to walk north, toward the Gamble residence on State Highway 789 where Cordell was.  There is no evidence that he knew Willenbrecht was with Cordell at the Gamble house, although he may have suspected as much.

[¶11]  As Shull[4] later explained to DCI agent Brady Patrick:

> Every step I took, I got a little bit more angry; angry at the fact my wife cheated on me, angry at the fact she lied to me, angry at the fact that she'd been treating me like absolute shit.  And the only thing that I ever did was tell her, "Hey, you know what?  I want to work on things because I love you to death."  And at there – out there, around 6:45, I walked the entire way out there, and it didn't help my anger at all.

[¶12]  On the other hand, Shull also told law enforcement that he planned to crawl into bed with his wife without waking her.  He said he intended to try to talk with her in the morning to try to work things out.

[¶13]  Shull's use of alcohol violated a condition of probation on misdemeanor convictions,[5] and he claimed that he therefore hid when he saw headlights to avoid

---

[4] Shull elected not to testify, and so what is known about his actions and state of mind on the night and morning in question comes in large part from an interview by Agent Patrick.

[5] Shull was originally placed on probation for misdemeanor possession of marijuana.  While on probation for that, he was convicted of driving under the influence, so he was actually on probation in two different cases for which, combined, he could have served a little less than a year if his probation was revoked.  His probation agent spotted him in a bar on October 17, and his presence there violated a condition of probation.  The agent told him to leave the bar and to come to his office the following Monday to discuss a sanction.  Shull had a petition for revocation of probation pending for other violations at that time as well.

detection. Of course, this conduct could also suggest a stealthy approach to the Gamble home with the intent to do Cordell or someone else harm.

[¶14] At approximately 3:16 a.m. Shull phoned his father, who was in Denver at the time. Because he initially missed the call, Shull's father returned it a minute later. Shull said his father could have his house and Jeep because he was probably going to jail for the rest of his life. At 3:33 a.m. his father telephoned the Fremont County emergency dispatcher to convey that information and his fear that Shull was alluding to committing a serious crime.

[¶15] Sometime between 4:30 and 5:00 a.m., Shull arrived at Gamble's house and went to an exterior door that led directly into Cordell's room. He discovered that she had uncharacteristically locked that door, and so he went to a kitchen window which he knew did not have a functioning lock. He climbed through the window and walked directly to his wife's room. In doing so, he passed through the kitchen and past an assortment of kitchen knives without taking one, which is arguably somewhat supportive of his claim to have acted on a sudden heat of passion. He then entered Cordell's room, shutting and locking the door behind him. He claimed that he first learned that Willenbrecht was in the house and in bed with Cordell only after entering the room and closing the door. He told investigators that he "lost it" at that point, and that he was "blinded by rage."

[¶16] Shull pulled out a folding, lock-back Gerber knife having approximately a three-inch blade and an overall length of seven and five-eighths inches, which he habitually carried. Shull grasped the open knife in his fist, with the blade pointed downward, and slipped his pinky finger into a ring built into the knife at the junction of the blade and handle to ensure a good, non-slip grip. It could be argued that this tended to show that he did not act on a sudden heat of passion, or on the other hand, that he simply had a habitual way of grasping a knife he used often.

[¶17] Within two seconds of entering the dimly lit room, he began repeatedly stabbing the sleeping Willenbrecht. Cordell and Willenbrecht awoke and started struggling with him, and Cordell also received a significant stab wound. Finally, Shull slit Willenbrecht's throat, killing him, choked Cordell into unconsciousness, and then escaped out the exterior door to the room while Gamble and her boyfriend frantically pounded on the locked interior door. Despite his efforts to avoid being seen as he fled back to Riverton, authorities located and arrested Shull around 8:00 that morning. He had the knife in his possession, and his clothing had blood on it that was later linked to Willenbrecht.

[¶18] The State ultimately filed an amended information charging Shull with the first degree murder of Willenbrecht, aggravated assault and battery of Cordell, and strangulation of a household member (Cordell). The case proceeded to trial.

4

[¶19] As will be discussed below, Shull admitted killing Willenbrecht intentionally and without a privilege to do so, such as self-defense. The key issue was whether he did so after premeditation and with malice (first degree murder), with malice but without premeditation (second degree murder), or in a sudden heat of passion (voluntary manslaughter). The decision had significant consequences. A conviction of first degree murder in a case in which the death penalty is not sought is punishable by imprisonment for life as a matter of law or life without the possibility of parole. Wyo. Stat. Ann. § 6-2-101(b). A conviction of second degree murder carries a minimum penalty of twenty years imprisonment and a maximum penalty of life imprisonment as a matter of law. Wyo. Stat. Ann. § 6-2-104. A conviction of voluntary manslaughter carries no minimum penalty and a maximum penalty of twenty years imprisonment. Wyo. Stat. Ann. § 6-2-105(b).

[¶20] The jury found Shull guilty of first degree murder, aggravated assault and battery, and strangulation of a household member. The district court sentenced him to life as a matter of law for the murder, eight to ten years for aggravated assault and battery, and four to five years for strangulation of a household member. He only appealed the first degree murder conviction.

## DISCUSSION

### 1. Jury Instructions on Sudden Heat of Passion and Burden of Proof

#### a. Instructions Given

[¶21] We will begin our consideration of this issue by examining the instructions given and the proceedings relating to them. In a motion in limine filed before trial, defense counsel[6] argued that the term "malice" as it is used in Wyoming's first and second degree murder[7] statutes should include the following language because of the interplay between those offenses and voluntary manslaughter, which he intended to present as a lesser included offense:

> The term "malice" means that the act constituting the offense was done recklessly under circumstances manifesting an extreme indifference to the value of human life, that the act was done without legal justification or

---

[6] Shull is represented by a different attorney on appeal.

[7] The word "malice" does not actually appear in the second degree murder statute, Wyo. Stat. Ann. § 6-2-104. The word "maliciously" is contained in the second degree murder statute. The district court defined both "malice" and "maliciously" in Instruction 19. Appellant points out that the definitions are somewhat contradictory. In light of the outcome of this appeal, we will not address this point, and will trust the district court to give it such consideration as it merits on retrial.

5

excuse, *and that the act was not done upon a sudden heat of passion.* [Emphasis added.]

[¶22] The emphasized language does not appear in Wyoming Criminal Pattern Jury Instruction 21.01D2, on which the rest of the instruction appears to have been based. The motion was heard immediately before trial began. The State objected to the instruction because it believed it to be improper to put the defendant's theory of defense into a substantive instruction. The prosecutor remarked that "I do not have to prove that he did not act in a heat of passion. I have to prove that he acted with malice." The Court held that sudden heat of passion was an element of voluntary manslaughter, and that the proposed language was therefore improper.

[¶23] The issue arose again at the formal instruction conference, and defense counsel objected to the State's proposed Instruction 15, which defined premeditated malice for the first degree murder charge. He requested that the definition of malice reflect that a killing under a sudden heat of passion was not done with malice. The Court noted that the proposed malice instruction was the criminal pattern, and declined to add the language.

[¶24] The State objected to instructing the jury on the lesser-included offense of voluntary manslaughter, but the Court did so over that objection. The instructions on voluntary manslaughter therefore read as follows:

Instruction No. 20

Pertinent portions of the Wyoming statutes provide as follows:

§ 6-2-105. Manslaughter;

(a) A person is guilty of manslaughter if he unlawfully kills any human being without malice, expressed or implied . . .

. . . Voluntarily, upon a sudden heat of passion.

Instruction No. 21

The elements of the lesser included offense of Voluntary Manslaughter in this case are:

1. On or about October 19, 2014,
2. in Fremont County, Wyoming,

3. the Defendant, Jeremiah Ethan Samuel Shull (Y.O.B. 1992),
4. voluntarily,
5. upon a sudden heat of passion,
6. killed Jacob Nash Willenbrecht.

If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

Instruction No. 22

As used in Instruction No. 21 "Voluntarily" means that the act which caused death was done intentionally. It does not require that the act was done with the intention of killing.

Instruction No. 23

As used in Instruction No. 21, "sudden heat of passion" means such passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same or similar circumstances as those in question which would cause him to act rashly, without reflection or deliberation, and from passion rather than from judgment. The heat of passion must be aroused suddenly, and the act resulting in death must occur while the defendant was acting under the direct and immediate influence of such heat of passion, and before sufficient time has elapsed to permit the heat of passion to cool.

[¶25] All of the above instructions are Wyoming criminal patterns. The instructions then moved on to the offense of aggravated assault and battery, the lesser included offense of battery, and the charge of strangulation of a household member. Immediately before general instructions not specific to any charge, this instruction was given:

Instruction No. 35

7

> The Defendant admits that he killed Jacob Nash Willenbrecht, but asserts that he is not guilty of First Degree Murder or Second Degree Murder, because the killing was done during a sudden heat of passion.
>
> A finding of sudden heat of passion negates malice.

[¶26] The district court used a stepped verdict form which instructed the jury to consider the first degree murder charge first, and to decide if Shull was guilty or not guilty of that crime. If it answered that he was guilty, it was to skip questions relating to second degree murder and manslaughter and to consider the charges of aggravated assault and battery and strangulation of a household member. Because the jury found Shull guilty of first degree murder, it did not answer the questions concerning second degree murder or manslaughter.

### b.  Propriety of the Instructions Regarding Allocation of Burden of Proof

[¶27] Appellant raises two issues with regard to the instructions relating to voluntary manslaughter and the interplay of "malice" with "sudden heat of passion." He contends that the instructions erroneously placed the burden of proving that he acted in a sudden heat of passion on the State when the State should have been required to prove beyond a reasonable doubt that he did not act in a sudden heat of passion. He also contends that the structure of the instructions and verdict form are such that the jury did not have to consider whether he acted in a sudden heat of passion, because the stepped verdict form and instructions relating to it directed the jury not to consider the offense of voluntary manslaughter if it convicted of first degree murder.

[¶28] We note at the outset that it is difficult to imagine a circumstance in which a prosecutor would charge voluntary manslaughter. That would involve proving something about the defendant's state of mind that negated malice. A review of our cases addressing convictions of voluntary manslaughter reveals that virtually all involved conviction as a lesser included offense after being charged with murder, or a guilty plea to voluntary manslaughter after murder charges were filed.[8] It is thus not at all surprising that the State charged only first degree murder and pointed out that its burden was to prove malice.

---

[8] An interesting exception began in *Lopez v. State*, 2004 WY 28, 86 P.3d 851 (Wyo. 2004). In that case, we found the evidence on which Lopez's conviction of second degree murder was based to be insufficient, and remanded for trial on the lesser included offense of voluntary manslaughter. *Id.* ¶ 42, 86 P.3d at 862-63. The State retried Lopez for voluntary manslaughter and obtained a conviction. *Lopez v. State*, 2006 WY 97, 139 P.3d 445 (Wyo. 2006). Lopez unsuccessfully claimed on appeal that he should have been convicted of criminally negligent homicide under Wyo. Stat. Ann. § 6-2-107. This may be an example of when sudden heat of passion is an element rather than a mitigating factor. See below.

[¶29]  The role of sudden heat of passion as a mitigating factor is explained in well-respected general authorities:

> The usual view of voluntary manslaughter thus presupposes an intent to kill . . . , holding that in spite of the existence of this bad intent the circumstances may reduce the homicide to manslaughter. . . .
>
> The usual type of voluntary manslaughter involves the intentional killing of another while under the influence of a reasonably-induced emotional disturbance (. . . "heat of passion") causing a temporary loss of normal self-control. Except for this reasonable emotional condition, the intentional killing would be murder.

2 Wayne R. LaFave, *Substantive Criminal Law* § 15.2(a) (2d ed., Oct. 2016 update).

> Voluntary manslaughter is an intentional killing in the heat of passion as a result of severe provocation. As a concession to human frailty, a killing, which would otherwise constitute murder, is mitigated to voluntary manslaughter.
>
> \*    \*    \*
>
> [A]t common law and by statute in most states, since the homicide must be committed under circumstances which would otherwise be murder, defendant may act with the intent to kill or with any mental state which amounts to "malice"; the malice is negated by the provocation and the offense is mitigated from murder to voluntary manslaughter.

2 Charles E. Torcia, *Wharton's Criminal Law* § 155 (15th ed., Sept. 2016 update).

[¶30]  This Court has said much the same thing:

> Our laws recognize an intermediate crime lying someplace between the excusable, justifiable or privileged killing of a human being, and the unlawful taking of a life with malice. This is an unlawful type of voluntary homicide which is not legally excused, privileged or justified, but wherein there is an absence of express legal, implied or

9

constructive malice. So we find in our law, that the intentional (i.e. voluntary) doing of the wrongful act [*i.e.*, killing], "upon a sudden heat of passion," although completely free of express, implied, constructive or legal malice, but committed without legal excuse, privilege or justification, is a punishable crime which we call voluntary manslaughter. This simply recognizes that there may be circumstances surrounding a killing which cannot be justified under the law of self-defense, and while not producing that degree of mental disturbance or aberration of the mind which is necessary in law to excuse the homicide, still leaves the mind devoid of that wicked, evil and unlawful purpose, or of that wilful disregard of the rights of others which is implied in the term "malice." Such circumstances mitigate or extenuate the act and make the homicide a crime of lesser degree. The "sudden heat of passion" contemplated by our voluntary manslaughter statute is descriptive of just such a state of mind, and it may occur from any emotional excitement of such intensity that it temporarily obscures reason, or leaves the mind bereft of reason.

*State v. Keffer*, 860 P.2d 1118, 1138-39 (Wyo. 1993) (quoting *State v. Helton*, 73 Wyo. 92, 115, 276 P.2d 434, 442 (1954)).

[¶31] These authorities make it clear that sudden heat of passion is a mitigator and not an element when a defendant is charged with murder. The question then arises as to which party should have the burden of proving or disproving this factor. The district court referred to sudden heat of passion as an element, based on our case law. However, although we have said otherwise at times, the question has been settled for many years as a matter of due process. 2 LaFave, *supra*, § 1.8(b) (question of whether State bears the burden of disproving a mitigator "was settled by *Mullaney v. Wilbur*").

[¶32] In *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct 1881, 44 L.Ed.2d 508 (1975), Mullaney killed a man who made a homosexual advance to him. *Id.* at 685, 95 S.Ct. at 1883. Maine law at the time required him to prove that he acted in the heat of passion on sudden provocation by a preponderance of the evidence. *Id.* The United States Supreme Court reversed, holding as follows:

Maine law requires a defendant to establish by a preponderance of the evidence that he acted in the heat of passion on sudden provocation in order to reduce murder to manslaughter. Under this burden of proof a defendant can

10

be given a life sentence when the evidence indicates that it is as likely as not that he deserves a significantly lesser sentence. This is an intolerable result in a society where, to paraphrase Mr. Justice Harlan, it is far worse to sentence one guilty only of manslaughter as a murderer than to sentence a murderer for the lesser crime of manslaughter. *In re Winship*, 397 U.S. [358], 372[, 92 S.Ct. 1068, 1076, 25 L.Ed.2d (concurring opinion). **We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case**.

*Mullaney*, 421 U.S. at 703-04, 95 S.Ct. at 1892 (emphasis added).

[¶33] The effect of the pattern instruction given here is perhaps more pernicious than that in *Mullaney*. The jury was told that the State had to prove sudden heat of passion. The State, quite understandably, argued that the killing was with malice. The effect of this instruction was to tell the jury that the party with the burden of proof could "opt out" of consideration of sudden heat of passion, thereby depriving Shull of a potential mitigator.

[¶34] If Shull presented some evidence that he acted in a sudden heat of passion, as the district court must have found he did, the jury should have been told that the State had the burden of proving the absence of a sudden heat of passion, much as it would have been if there had been a complete defense of self-defense. *Drennen v. State,* 2013 WY 118, ¶ 22, 311 P.3d 116, 124 (Wyo. 2013)

[¶35] The State points out that this Court has held just the opposite in the past – we have held that sudden heat of passion is an element the State must prove. We have also held that the State did not have to prove the absence of sudden heat of passion, in part because proof of malice necessarily rules out sudden heat of passion. *See, e.g., Yung v. State*, 906 P.2d 1028, 1035-36 (Wyo. 1995); *Janpol v. State*, 2008 WY 21, ¶¶ 9, 10, 178 P.3d 396, 400 (Wyo. 2008). *But cf. Lane v. State*, 12 P.3d 1057, 1062 (Wyo. 2000) (Court suggested it had gone too far in describing sudden heat of passion as an element after the district court failed to define the term).

[¶36] These holdings are untenable in light of *Mullaney*. *Mullaney* did not equivocate. The district court decided that the jury should be allowed to consider the mitigator of sudden heat of passion, and the jury should have been entitled to a correct set of instructions regarding it. Other authorities take *Mullaney* at face value, including the authors of a leading compilation of federal jury instructions:

> The Supreme Court held that in order to obtain a murder conviction, the prosecution must "prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." *Mullaney v. Wilbur*, 421 U.S. 684, 697-98, 704, 95 S.Ct. 1881, 1888-89, 1892, 44 L.Ed.2d 508 (1975). Failure to impose this requirement exempts the government from its obligation to prove the defendant guilty of murder beyond a reasonable doubt. *See Mullaney*, 421 U.S. at 697-98, 95 S.Ct. at 1888-89, 1892.

2A Kevin F. O'Malley et al., *Federal Jury Practice and Instructions*, note to § 45.09 (6th ed., Aug. 2015 update).

[¶37]  The voluntary manslaughter statute does not tell us whether sudden heat of passion is an element or a mitigator, and, as we have already said, it is nearly impossible to imagine a case in which a prosecutor would charge voluntary manslaughter and assume the burden of proving sudden heat of passion.[9]  The statutory scheme creates a situation in which an absence of premeditation reduces an offense to second degree murder if there is malice, and to voluntary manslaughter if the State cannot disprove sudden heat of passion if there is some evidence to support the mitigator.

[¶38]  As *Mullaney* observed while discussing an argument that proving the absence of sudden heat of passion could be difficult:

> Indeed, the Maine Supreme Judicial Court itself acknowledged that most States require the prosecution to prove the absence of passion beyond a reasonable doubt. Moreover, the difficulty of meeting such an exacting burden is mitigated in Maine where the fact at issue is largely an "objective, rather than a subjective, behavioral criterion." *State v. Rollins*, 295 A.2d [914], at 920 [(Me 1972)]. In this respect, proving that the defendant did not act in the heat of passion on sudden provocation is similar to proving any other element of intent; it may be established by adducing evidence of the factual circumstances surrounding the commission of the homicide. And although intent is typically considered a fact peculiarly within the knowledge of the defendant, this does not, as the Court has long recognized, justify shifting the burden to him. See *Tot v. United States*, 319 U.S. 463, 469, 63 S.Ct. 1241, 1245, 87 L.Ed. 1519 (1943); *Leary v. United*

---

[9] See the discussion of *Lopez v. State, supra*, note 8.

*States*, 395 U.S. 6, 45, 89 S.Ct. 1532, 1552, 23 L.Ed.2d 57 (1969).

> Nor is the requirement of proving a negative unique in our system of criminal jurisprudence. Maine itself requires the prosecution to prove the absence of self-defense beyond a reasonable doubt. *See State v. Millett*, 273 A.2d 504 (1971).[30] Satisfying this burden imposes an obligation that, in all practical effect, is identical to the burden involved in negating the heat of passion on sudden provocation. Thus, we discern no unique hardship on the prosecution that would justify requiring the defendant to carry the burden of proving a fact so critical to criminal culpability.

*Mullaney*, 421 U.S. at 701-02, 95 S.Ct. at 1891 (footnotes and some citations omitted).

[¶39] The jury should have been given instructions which properly allocated the burden to disprove sudden heat of passion. (See discussion of *Wilkerson v. State* below). O'Malley suggests the following means of allocating the burden of proof in an instruction for second degree murder in a note to their pattern instruction:

> If there is evidence that the defendant acted upon a sudden quarrel or heat of passion, a fourth element, as well as some additional defining language, should be added. For example,
>
> "*Four:* The defendant did not act upon a sudden quarrel or in the heat of passion caused by adequate provocation."

2A O'Malley, *supra*, note to § 45.04. Colorado similarly suggests an instruction that directs the jury to consider heat of passion if it finds guilt of second degree murder and to answer a special interrogatory on this issue. Colorado Criminal Pattern Jury Instruction 3-1:08 (2015).

[¶40] Shull also contends that the stepped nature of the verdict form and the instructions concerning its completion and the placement of Instruction 35 effectively divorced the question of sudden heat of passion from the question of malice, while the two are intertwined. The State contends that Instruction 35 effectively cures that particular problem. We will address this in connection with our inquiry as to whether there is error requiring reversal.

### c. Standard of Review and Significance of Errors

[¶41] We have said the following concerning jury instructions:

As we have previously noted, the United States Supreme Court has said that a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Griego v. State*, 761 P.2d 973, 975 (Wyo. 1988) (quoting *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983)). The same principle applies to jury instructions. The purpose of jury instructions is to "provide the jury with a foundational legal understanding to enable a reasoned application of the facts to the law." *Walker v. State*, 2013 WY 58, ¶ 31, 302 P.3d 182, 191 (Wyo. 2013). In order to support a reliable verdict, it is crucial that the trial court correctly state the law and adequately cover the relevant issues. *Id*. Ultimately, the test of adequate jury instructions is "whether the instructions leave no doubt as to the circumstances under which the crime can be found to have been committed." *Id*. (quoting *Burnett v. State*, 2011 WY 169, ¶ 14, 267 P.3d 1083, 1087 (Wyo. 2011)).

*Wilkerson v. State*, 2014 WY 136, ¶ 25, 336 P.3d 1188, 1199 (Wyo. 2014). On the other hand, we have also recognized that as long as jury instructions correctly state the law and leave no doubt as to the circumstances in which a crime can be found to have been committed, the trial court has considerable discretion in the assembly of instructions it gives and in the wording used.

A trial court does not abuse its discretion by referring the jury to instructions that, when viewed as a whole and in the context of the entire trial, fairly and adequately cover the issues. *Budder v. State*, 2010 WY 123, ¶ 7, 238 P.3d 575, 577 (Wyo. 2010).

*Cecil v. State*, 2015 WY 158, ¶ 14, 364 P.3d 1086, 1090 (Wyo. 2015).

[¶42] With regard to the allocation of the burden of proving the absence of sudden heat of passion, trial defense counsel did not object to Instruction 21, which allocated the burden of proving what we have found to be a mitigator to the State. The State contends that we should review for plain error. Plain error exists when: (1) the alleged error is of record; (2) the error violates a clear and unequivocal rule of law in a clear and obvious, not merely arguable, way, and; (3) the error adversely affected a substantial right to the appellant's material prejudice. *Jealous v. State*, 2011 WY 171, ¶ 11, 267 P.3d 1101, 1104 (Wyo. 2011).

[¶43]  Shull contends, on the other hand, that the error was structural, and that reversal is required.  A structural error, as distinguished from a trial error, is a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.  *See Neder v. United States*, 527 U.S. 1, 8-9, 119 S.Ct. 1827, 1833-34, 144 L.Ed.2d 35 (1999).  In *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), the United States Supreme Court ruled that the failure to properly allocate the burden of proof is a structural error:

> [T]he essential connection to a "beyond a reasonable doubt" factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof, which vitiates *all* the jury's findings. A reviewing court can only engage in pure speculation—its view of what a reasonable jury would have done. And when it does that, "the wrong entity judge[s] the defendant guilty."

*Id*. at 281, 113 S.Ct. at 2082.  *See also Granzer v. State*, 2008 WY 118, ¶ 16, 193 P.3d 266, 271 (Wyo. 2008) (acknowledging the rule generally).  The distinction between structural error and harmless (or plain) error is critical – if an error is structural, the conviction must be reversed.  7 LaFave, *Criminal Procedure* § 27.6(d) (4th ed., Dec. 2016 update).

[¶44]  The State correctly points out that after *Sullivan*, the United States Supreme Court has held that various instructional errors, including failure to instruct on an element, are subject to harmless error analysis if there has been an objection, rather than treatment as structural error.  *See*, *e.g., Hedgpeth v. Pulido*, 555 U.S. 57, 61, 129 S.Ct. 530, 532, 172 L.Ed.2d 388 (2008) (per curiam); *Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (omission of an element of an offense); *California v. Roy,* 519 U.S. 2, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996) (per curiam) (erroneous aider and abettor instruction); *Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987) (misstatement of an element of an offense); *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (instruction that malice was presumed analyzed under a harmless error standard).

[¶45]  We have applied this principle in the past, *see Granzer*, ¶ 18, 193 P.3d at 271-72 (failure to instruct on an element of a crime), and we generally have no quarrel with it now.  It would require plain error analysis in the absence of an objection to the instruction placing the burden of proving sudden heat of passion on the State.  However, the instruction in this case goes farther.  As we have already noted, it allocates the burden of proving a sudden heat of passion to the State, which understandably had no inclination or motivation to prove it, and every reason to disprove it.  This effectively allowed the State to control the jury's consideration of the mitigator that Shull relied upon.  This was

more than a simple instructional error – it created one of those rare cases in which an instructional error is structural. It is closer to the error found to be structural in *Sullivan* than errors held not to be. 7 LaFave, *supra*, § 27.6(d) (listing cases in which errors were held structural and those subject to harmless error review). It requires reversal. This error was compounded by the manner in which the jury was instructed to consider sudden heat of passion.

[¶46] Trial defense counsel did preserve the claim that the element of sudden heat of passion should be tied to the definition of malice early in the instructions by objecting to the definition of malice and suggesting language which would have connected the definition of malice to a sudden heat of passion. He also asked that the verdict form contain a special interrogatory as to whether the jury found a sudden heat of passion or not. The trial judge declined to submit that question. This record would require us to determine whether this was in fact error, and if so, whether it was harmless. *Morris v. State*, 2009 WY 88, ¶ 15, 210 P.3d 1101, 1105 (Wyo. 2009). The State argues this point is adequately covered in Instruction 35, which is quoted above. That instruction does say that "[a] finding of sudden heat of passion negates malice."

[¶47] However, because it comes so late in the instructions, Shull contends that the jury would not have had occasion to consider it in connection with the stepped verdict form which required the jury to consider first degree murder under a definition of malice unconnected to the mitigator of sudden heat of passion. After that, it was directed to skip the questions which might have directed it back to the question of sudden heat of passion.

[¶48] We noted above that the federal pattern instructions and the Colorado patterns are structured so as to direct the jury to the issue of whether a killing was done under a sudden heat of passion while it is considering murder charges. To do so is therefore hardly unprecedented.

[¶49] In *State v. Hinrichsen*, 877 N.W.2d 211 (Neb. 2016), the Nebraska Supreme Court upheld a conviction for first degree murder despite a contention that the stepped instructions used prevented the jury from considering a "sudden quarrel" theory[10] until it had found the defendant guilty of first degree murder, thereby shifting the burden of proof from the state to the defendant. *Id.* at 226-27. In a special concurrence, Justice Wright pointed out the problem with the stepped verdict form in a case involving these kinds of issues, as had a dissenting justice:

> Premeditation or provocation are fact issues that should be considered simultaneously when there is proper evidence of a provocation. The logic of this rule is that since provocation negates premeditation and premeditation

---

[10] "Sudden quarrel" is similar to Wyoming's "sudden heat of passion."

16

negates provocation, the jury should consider and decide this question at the same time. When the defendant has presented proper evidence that the defendant was acting under a provocation, that issue should be addressed at the same time that the jury considers whether the act causing the death was premeditated.

In a first degree murder case, the State presents its evidence that the murder was premeditated. If the defendant offers evidence that the killing was the result of provocation, the State's evidence must establish beyond a reasonable doubt that the murder was not the result of a provocation. In that manner, the burden remains upon the State to prove the elements of the crime and thus, the burden of proof never shifts to the defendant. The State disproves the defense of provocation by its evidence of premeditation. The question is whether the State's evidence negates beyond a reasonable doubt the claim of provocation. The State negates the defendant's claim of provocation by presenting evidence that proves beyond a reasonable doubt that the defendant killed the victim with premeditation and malice aforethought.

An acquittal first step instruction precludes the jury from effectively considering the factual issue of provocation in its determination of a defendant's guilt. . . . And under a step instruction on the three degrees of homicide, the jury must acquit the defendant of first and second degree murder before it considers the issue of provocation. This has the effect of prioritizing the evidence by requiring the jury to consider first and second degree murder before it can consider the evidence of provocation. I agree with the dissent's position that the court is required to instruct the jury in a manner that explains the jury's options . . . of whether to convict the defendant of first degree murder, second degree murder, or manslaughter.

*Id.* at 230-31 (Wright, J., concurring in the result).[11]

[¶50]  We have in the past generally approved of stepped verdict forms, and we continue to do so.  *Evanson v. State*, 546 P.2d 412, 415 (Wyo. 1976).[12]  It is normally entirely

---

[11] Justice Wright concurred despite the quoted reservations because he did not believe the evidence justified giving an instruction on sudden quarrel.

17

reasonable to proceed from the most serious offense to lesser included offenses. However, those justices disagreeing with the majority's decision in *Hinrichsen* make a valid point – the stepped form used in this case does not work well in murder cases in which the mitigating factor of sudden heat of passion is properly raised. It would certainly be appropriate to use the stepped form on retrial, and it could easily be modified to assure that the mitigating factor is considered. We will leave it to the trial judge to find the best means of assuring that the jury considers the sudden heat of passion mitigator in connection with the definition of malice, but in our view that would not be the manner in which the instructions given in this case were structured.

[¶51]  Shull's first degree murder conviction must be reversed due to structural error, and the case must be remanded for a new trial.

## 2. Intentional Killing and Voluntary Manslaughter

[¶52]  Because we reverse and remand this case for a new trial, it is not strictly necessary for us to address this issue. However, we do so in the interest of judicial economy, and to offer guidance for the new trial. *See, e.g., Phillips v. State*, 597 P.2d 456, 463 (Wyo. 1979).

[¶53]  The record reflects confusion as to whether voluntary manslaughter includes a killing in which the defendant has the subjective intent to kill. This was a critical issue, as Shull did not deny killing Willenbrecht intentionally, and the evidence of multiple stabbings and slashing his throat certainly support a conclusion that he did so. As noted above, trial defense counsel filed a motion in limine seeking to link the mitigator of sudden heat of passion to the definition of malice, which we have already discussed. In a hearing immediately before trial began, defense counsel made this comment:

> [The State] want[s] to say that all you need . . . for malice is to consciously decide to kill and to kill. People under sudden heat of passion are consciously deciding to kill, but they are under a sudden heat of passion which removes their mind from reason without the sufficient cool-off time.

In response, the prosecutor stated:

> I have never read a case that says that a person who kills under heat of passion has consciously decided to kill. If I see that case, I'll eat my shoe.[13] But I have never seen it, and I have read a lot of cases in my day.

---

[12] We recognize that *Janpol, supra,* dealt with issues similar to this case and reached a different result.

[13] As the following discussion indicates, the day has come to make good on that promise.

[¶54]  No ruling was required on this precise issue at that point, and the trial proceeded with defense counsel acknowledging that Shull killed Willenbrecht intentionally but arguing that he did so under a sudden heat of passion.  This then occurred in closing argument:

> [Defense Counsel]: The heat of passion must be aroused suddenly.  You know, we've got him turning around, seeing him in bed, and he pulls out his knife, and he attacks him.
>
> And the act resulting in death.  So you know, the act resulting in death is these nine stab wounds and seven cutting wounds.  You know, the act resulting in death, I mean, these are acts of a -- of a person who is under a sudden heat of passion, who has just lost it.
>
> And does he intend to kill? Yes, obviously,  the people who kill somebody under sudden heat of passion, that's what they mean to do.
>
> [Prosecutor]: Objection, Your Honor. That, I believe, is a misstatement of the law.
>
> THE COURT: Sustained.

[¶55]  The prosecutor then made these statements in rebuttal closing argument:

> Certainly, the defendant has an explanation of his own for all the precursor activities that we talked about before the killing in this case. But except for the -- in the end, he stabbed a guy 17 times. So if we -- or 16 times. So if we take a  look at the facts, it all adds up to murder.
>
> *   *   *
>
> The defendant coins this as just losing it. And I believe [defense counsel] said, "And he started stabbing and slashing." You don't have to take that explanation. Sixteen wounds can be taken by you as evidence of intent and continued intent.
>
> *   *   *

19

> Nowhere in your instructions will you see any requirement that there be any planning at all. All you have to do is make a conscious decision to kill and then kill.

[¶56] After the jury rendered its verdict, defense counsel filed a motion for a new trial under Wyoming Rule of Criminal Procedure 33, in which he argued that the ruling and argument told the jury that an intentional killing cannot be manslaughter. The motion was denied.

[¶57] Shull argues that this ruling effectively told the jury that he could not avail himself of the lesser included offense of voluntary manslaughter if he killed Willenbrecht on purpose. The State contends that the ruling and ensuing argument did not amount to an instruction.[14] It also contends that the argument was an overly broad generalization, which led to the objection being sustained, and that the prosecutor did not actually say that killing in the heat of passion could not be intentional.[15]

[¶58] It is unnecessary to address the standard of review since this case will be remanded for a new trial. Suffice it to say that there is ample authority that a sudden heat of passion killing not only can be, but often is, intentional.

[¶59] As already noted, Wyo. Stat. Ann. § 6-2-105 provides as follows:

> (a) A person is guilty of manslaughter if he unlawfully kills any human being without malice, expressed or implied . . . .
>
> (i) Voluntarily, upon a sudden heat of passion[.]

[¶60] This statute "adopted the common law definition of the crime of voluntary manslaughter." *Jahnke v. State*, 692 P.2d 911, 919 (Wyo. 1984), *overruled on other grounds by Vaughn v. State*, 962 P.2d 149, 151 (Wyo. 1998). Accordingly, where the defense to murder is voluntary manslaughter, the killing is voluntarily committed, i.e., the killing is intentionally done.

---

[14] It also claims that Shull's counsel did not preserve the claimed error. We disagree. Defense counsel's statement, the objection, and the ruling are in the record. Wyoming Rule of Criminal Procedure 51 and Rule of Civil Procedure 46 both provide that exceptions to rulings are unnecessary to obtain review. These provisions save trial judges considerable annoyance at having counsel revisit issues on which they have ruled, if they accomplish nothing else. We consider the claimed error to have been preserved for appellate review.

[15] We have difficulty believing that the State or the trial judge was concerned about correcting a generalization which might be overly broad. This jury was tasked with deciding Shull's degree of guilt, not analyzing the veracity of a syllogism.

> "Voluntarily" does mean intentionally. *State v. Helton*, 73 Wyo. 92, 276 P.2d 434 (1954). It denotes the condition of the mind at the time of the homicide and distinguishes a "voluntary" act from one which occurs by accident. *Ivey v. State*, 24 Wyo. 1, 154 P. 589 (1916). In this respect, the function of the phrase is similar to "purposely" in the second degree murder statute. . . . "Voluntarily, upon a sudden heat of passion" then sets forth the extenuating circumstance that mitigates an offense, which would otherwise be second degree murder, to manslaughter.

*Keffer*, 860 P.2d at 1138.

> Voluntary manslaughter in most jurisdictions consists of an intentional homicide committed under extenuating circumstances which mitigate, though they do not justify or excuse, the killing. The principal extenuating circumstance is the fact that the defendant, when he killed the victim, was in a state of passion engendered in him by an adequate provocation (i.e., a provocation which would cause a reasonable man to lose his normal self-control).

2 LaFave, *supra*, § 15.2. "Most killings which constitute voluntary manslaughter are of the intent-to-kill sort—so much so that voluntary manslaughter is often defined in the cases (and sometimes, by statute) as if intent to kill were a required ingredient." *Id.* § 15.2(a). *See also* 2 Wharton's Criminal Law, *supra*, § 155.

[¶61] As noted above, the pattern instruction the district court gave provides that "voluntarily" means that the act causing death must be intentional, although the actor may not have intended to kill the victim. *See* Instruction 22, drawn directly from Wyoming Criminal Pattern Jury Instruction 21.05B. This is a true statement, but it does not mean, as the above authorities indicate, that a voluntary killing cannot occur with the intent to kill. In other words, a killing with intent to kill is voluntary, although a subjective intent to kill is not required. On retrial, it would be improper to instruct or suggest that a killing under a sudden heat of passion cannot include a case in which the defendant has the subjective intent to kill.

## 3. Definition of Malice for First Degree Murder

[¶62] The definition of premeditated malice in Instruction 15 was as follows:

> "Premeditated malice" means that the Defendant thought about and considered the idea of killing before the act which

21

caused the death was committed, and that the act which caused death was done with intent to kill and without legal justification and excuse.

[¶63] Shull argues that this instruction is incorrect and prejudicial because this Court has held as follows:

> In the context of first degree murder, this Court recently approved a jury instruction defining "malice" to mean "that the act(s) constituting the offense charged was/were done intentionally, without legal justification *or* excuse or that the act(s) was/were done in such a manner as to indicate hatred, ill-will, or hostility towards another." *Rolle v. State*, 2010 WY 100, ¶ 32, 236 P.3d 259, 273 (Wyo. 2010). Earlier, however, in *Keats v. State*, 2003 WY 19, ¶ 16, 64 P.3d 104, 106 (Wyo. 2003), the Court made it clear that . . . malice requires proof of an intentional act done without legal justification or excuse *and* hatred, ill will or hostility. We think the latter approach finds better support in the law in the context of first degree murder. . . . *We hold that juries must be instructed in first degree murder cases that "malice" means the defendant acted intentionally without legal justification or excuse **and with hatred, ill will or hostility***. Because the jury instruction in Mr. Johnson's case stated that malice means the acts constituting the offense charged were done intentionally, without legal justification or excuse *or* were done in a manner indicating hatred, ill will, or hostility towards another, it was not a correct statement of the law.

*Johnson v. State*, 2015 WY 118, ¶ 19, 356 P.3d 767, 772-73 (Wyo. 2015) (most emphasis added).

[¶64] The premeditated malice instruction given does not, of course, contain the language *Johnson* requires. The jury in this case was instructed on July 20, 2015, and *Johnson* was not decided until September 3, 2015, and so the trial judge could not have known of its holding. We are confident the district court will apply *Johnson* when the case is retried.

## 4. The Dispatcher's Recording

[¶65] We address this issue for the same reasons we addressed the last two questions raised by this appeal – to promote judicial economy and to provide guidance for a retrial.

As noted above, Shull's father contacted the Fremont County emergency dispatcher in an attempt to get law enforcement to intervene with his son because he was in Denver and could not do so. The recording of that phone call conveyed his identification of Shull and the following comments:

> Well, unfortunately, he's my son. He is dumber than a rock. And he's, uh, right now it sounds like he's drunk. He calls me up and says that I can have his house and his jeep and he's probably going to jail for the rest of his life. **So I'm assuming that he's alluding to committing a crime that is fairly serious.**
>
>              \*     \*     \*
>
> **It sounded like he's headed over there to do absolutely no good. Him and his wife have been fighting it looks like they may be divorcing. It just sounds like a bad place . . . right now if you could get an officer out there as fast as possible and pick him up for public intoxication then we might avoid something considerably more serious.**

[¶66] The recording was played for the jury over Shull's objection to the bolded portion. He now claims, as he did at trial, that this part of the statement was an improper lay witness opinion, and that its admission constitutes reversible error.[16]

[¶67] This Court reviews the admission of evidence under the deferential abuse of discretion standard, and it will not disturb a district court's decision in that regard unless an appellant carries the burden of showing that there was no legitimate basis for that decision. Even if the district court erred, we will not reverse if the error was harmless. *Toth v. State*, 2015 WY 86A, ¶ 35, 353 P.3d 696, 707 (Wyo. 2015).

[¶68] Opinions or inferences voiced by a lay person are admissible only if they "are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." W.R.E. 701. We have held that the first of those requirements incorporates the "personal knowledge" mandate of W.R.E. 602, which states in pertinent part: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself."

---

[16] Shull does not contest the admission of that portion of the recording which contains his father's report of statements made by Shull during their earlier phone conversation, which is the unbolded part of the quote above.

[¶69] Thus, both rules bar the admission of evidence of a person's opinions, suspicions, or beliefs regarding a particular matter unless they are rationally grounded in his personal perception of that matter through his own senses. They may not be grounded in pure speculation or in knowledge obtained only from the descriptions of others. *Schmunk v. State*, 714 P.2d 724, 733-35 (Wyo. 1986). As a leading commentator explains:

> *Mental state of another.* It is very hard to say how far a lay witness should be allowed to go in interpreting the mental state of another—her knowledge, intent, understanding, or feelings, or what she meant by what she said. On the one hand, such testimony is necessarily highly interpretive, often subjective and very much affected by extraneous relational factors, and in common experience people are often seriously mistaken on such points. It is easy to get too much interpretive gloss and not enough specific underpinning, and to wind up with speculation and guesswork. Here obviously the testimony is not helpful and not rationally based either, and it should be excluded.

3 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* § 7:5 (4th ed., May 2016 update).

[¶70] The contested portion of the recorded phone call to the dispatcher is speculation. It goes beyond predicting Shull's state of mind – it is a prediction of what Shull will do in the future extrapolated from statements he made. Based on his perception that Shull sounded drunk when he offered up his home and his Jeep, and on Shull's statement about going to jail for the rest of his life, his father "assumed" Shull was "alluding" to committing a fairly serious crime against his wife.

[¶71] Shull's father would have to have been clairvoyant to know what Shull was planning unless Shull told him or engaged in behavior that evidenced the intent. The fact that this speculation ultimately turned out to be accurate does not make it admissible. It violated Rules 602 and 701. The portion of the statements that Shull actually made to his father are admissible and of course very damaging to his sudden heat of passion theory. We do not need to analyze whether the improper portion of the statement was sufficiently prejudicial to require retrial in light of the damning nature of the admissible portions because the case will be retried.

**CONCLUSION**

[¶72] The instruction allocating the burden of proving the mitigating factor of sudden heat of passion to the State, when the burden should have been to disprove that factor,

was a structural error requiring reversal. We reverse and remand for a new trial of the first degree murder charge. The convictions for aggravated assault and battery and strangulation of a household member were not challenged on appeal, and they are not affected by this decision.