2017 WY 98

Phillip SAM, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

S-16-0168

Supreme Court of Wyoming.

August 24, 2017

Rehearing Denied September 26, 2017

Representing Appellant: Office of the State Public Defender: Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; Eric M. Alden, Senior Assistant Appellate Counsel. Argument by Mr. Alden.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Caitlin F. Young, Assistant Attorney General. Argument by Ms. Young.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

FOX, Justice.

[¶1] Phillip Sam was 16 years old when he arranged to meet a group of teens at a park in Cheyenne, Wyoming, armed himself with his mother's boyfriend's .40 caliber pistol, and went to the park to wait for the rival group to arrive. As the group approached, Mr. Sam stepped out from behind a tree and shot repeatedly in the group's direction. Two young men were injured—one fled and the other fell to the ground. Mr. Sam approached the fallen youth and shot him in the head, a shot which resulted in the youth's death. A jury found Mr. Sam guilty of one count of first-degree murder, one count of aggravated

assault and battery, and ten counts of attempted aggravated assault and battery.

[¶2] Mr. Sam raises numerous issues on appeal. We conclude that: the district court did not abuse its discretion when it denied the motion to transfer his case to juvenile court; although there were some errors in the jury instructions, they were not prejudicial; although the prosecutor's victim impact arguments were improper, they were not prejudicial; there was sufficient evidence to support the attempted aggravated assault charges despite the fact there was no evidence he intended to shoot any particular individual; the sentence imposed on Mr. Sam exceeds the limits imposed by *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) and *Bear Cloud v. State*, 2014 WY 113, 334 P.3d 132 (Wyo. 2014) (*Bear Cloud III* ); the aggregate sentence does not deprive the parole board of its statutory authority to consider parole of juveniles after 25 years; and Mr. Sam's sentences for first-degree murder and aggravated assault do not violate double jeopardy. We affirm in part, and reverse in part and remand for resentencing.

## ISSUES

[¶3] The parties use different techniques, but generally agree these are the issues raised in this appeal:

I. Did the district court abuse its discretion when it denied the motion to transfer the proceedings to juvenile court?

A. Was Mr. Sam's statutory right to cross-examine witnesses violated?

B. Did the district court properly assess the facilities available to juveniles?

C. Did the district court properly weigh the likelihood of rehabilitation?

II. Did the district court improperly instruct the jury when it:

A. Failed to remove a corrected instruction from the official instruction packet?

B. Failed to define "attempt"?

C. Gave the incorrect definition of "malice"?

D. Gave the definition of "reckless" rather than the definition of "enhanced recklessness"?

E. Gave the incorrect inference of malice instruction?

F. Gave incomplete and incorrect self-defense instructions?

III. Did the prosecutor commit misconduct when he made victim impact arguments in his closing argument?

IV. Was there sufficient evidence to support Mr. Sam's convictions for aggravated assault, even though there was no evidence that he intended to harm any particular individual?

V. Is the sentence imposed upon Mr. Sam excessive because it:

A. Violates the Eighth Amendment because it is a de facto life without parole sentence?

B. Deprives the parole board of its statutory authority to consider parole of a juvenile after 25 years?

C. Violates the constitutional prohibition against double jeopardy because it sentences Mr. Sam for both the murder and the aggravated assault of the same victim?

## FACTS

[¶4] Mr. Sam had ongoing conflict with a rival youth group, which escalated on October 4 and into the early hours of October 5, 2014. The afternoon of the 4th, Mr. Sam stole a .40 caliber S&W semi-automatic pistol from his mother's boyfriend. Later, he had several communications with members of the rival group about setting up a fight. He made sure the group was primed to fight when he went out to the mall where they were watching a movie, located one of their cars, and broke its mirror and slashed its tires. Mr. Sam then went to hang out at his friend Timber Strange's house. He took out the gun to show his friends and "said that he was going to kill someone that night."

[¶5] When the car's owner discovered the damage, one of the rival group, Damian Brennand, immediately called Mr. Sam, believing he was "the only known person who would have done it," and "told him ... he needed his ass beat," and that he was going to bring a gun to the park to shoot Mr. Sam.

Later, one member of the group called Mr. Sam back to say they "couldn't get their hands on a gun. They couldn't find one," but they wanted to meet him and fight. Mr. Sam changed the location of the encounter to Martin Luther King Park and went there with five friends. Mr. Sam took the pistol, and he and Timber Strange sat in a pavilion for about 15 minutes. Mr. Strange testified:

I had asked him if this was actually what he wanted to do, if he actually wanted to do this.

Q. [Prosecutor] And by this, what did you mean?

A. As in hurt people and potentially kill somebody.

Q. And what did he say?

A. He had said, yeah, that he had felt that he needed to do it.

[¶6] When one of their friends called to tell them the rival group was approaching, Mr. Sam and Mr. Strange, who had bandanas on their faces, moved to stand between some trees. As the group of 12 youths approached, the two stepped out from the trees and Mr. Sam shot repeatedly. One bullet grazed Damian Brennand's arm, and another struck Tyler Burns in the chest. Mr. Burns fell to the ground. Mr. Sam approached Mr. Burns, who said "no" three or four times, and Mr. Sam shot him through his hand and head. Mr. Burns died as a result. The other 10 members of the rival group were not injured. Mr. Sam was 16 years old.

[¶7] Mr. Sam was charged on October 7, 2014, with 12 counts of aggravated assault and battery with a deadly weapon, and one count of first-degree murder.[1] On October 28, 2014, he filed a motion to transfer his case to juvenile court, pursuant to Wyo. Stat. Ann. § 14-6-237(g). The district court entered its order denying transfer on March 17, 2015. Mr. Sam filed a petition for review of that decision, which this Court denied on November 4, 2015. (The current appeal was docketed on July 1, 2016, when Mr. Sam was 18 years old.)

[¶8] After a six-day trial, the jury returned a verdict of guilty on all counts. Mr. Sam filed a motion for a new trial, arguing that the jury instruction on "malice" in first-degree murder was incorrect under *Johnson v. State*, 2015 WY 118, 356 P.3d 767 (Wyo. 2015), which was published after the Sam trial. In addition, at the district court's request, the parties briefed the question of whether it was necessary to define " 'attempt' as it may apply to the various counts of Aggravated Assault and Battery." After a hearing on the two issues, the district court denied the new trial motion.

[¶9] Mr. Sam was sentenced to life for the first-degree murder charge. He could be eligible for parole after 25 years on that sentence because he was under 18 at the time of the crime. Wyo. Stat. Ann. § 6-10-301(c) (LexisNexis 2017). He was sentenced to 9 to 10 years on each of the aggravated assault charges, which the district court bunched into three concurrent terms to be served consecutively—the sentence is life + 9-10 x 3, or, without counting good time, parole eligibility for Mr. Sam in 52 years (25 + 27), when he would be 70 years old.

## DISCUSSION

### I. The district court did not abuse its discretion when it denied the motion to transfer proceedings to juvenile court

[¶10] The State has the burden of persuasion in transfer motions, *JB v. State*, 2013 WY 85, ¶ 10, 305 P.3d 1137, 1141 (Wyo. 2013), and we review such decisions for an abuse of discretion. *Hansen v. State*, 904 P.2d 811, 824 (Wyo. 1995). The district court conducted a three-day transfer hearing, and issued a comprehensive Order Denying Motion to Transfer Proceedings to Juvenile Court, in which it analyzed the statutory factors to be considered by the judge in deciding whether a child should be tried in juvenile court or district court. They are:

(i) The seriousness of the alleged offense to the community and whether the protection of the community required waiver;

(ii) Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;

---

1. He was originally charged with 13 counts of aggravated assault and battery, but one count was dismissed by the circuit court at the preliminary hearing.

(iii) Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted;

(iv) The desirability of trial and disposition of the entire offense in one (1) court when the juvenile's associates in the alleged offense are adults who will be charged with a crime;

(v) The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living;

(vi) The record and previous history of the juvenile, including previous contacts with the law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this court, or prior commitments to juvenile institutions;

(vii) The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the juvenile court.

Wyo. Stat. Ann. § 14-6-237(b) (LexisNexis 2017).

[¶11] Mr. Sam challenges the decision to deny the transfer motion on three grounds: he contends that his confrontation rights were violated when a police detective was permitted to testify about the allegations against Mr. Sam based on what he had been told by witnesses; he contends that the district court was mistaken about the duration of facilities available to juveniles; and he argues that the district court ignored "uncontested" evidence that he presented a good likelihood of rehabilitation. We find that the district court correctly interpreted the statutes governing juvenile proceedings, and did not abuse its discretion.

A. **Mr. Sam's statutory right to cross-examine adverse witnesses was not violated**

[¶12] Mr. Sam argues that the district court violated Wyoming statutes and the confrontation clauses of the Wyoming and United States constitutions when it admitted

statements of witnesses through the State's lead investigator, Detective Harper. Detective Harper testified regarding the nature of the allegations against Mr. Sam, based largely on interviews with Mr. Sam and other witnesses and the reports of other law enforcement officers.

[¶13] Neither the confrontation clause nor the rules of evidence apply to juvenile transfer hearings. The confrontation clauses of the United States and Wyoming constitutions specifically refer to "criminal prosecutions." U.S. Const. amend. VI; Wyo. Const. art. 1, § 10. Juvenile proceedings are civil matters not criminal prosecutions. *See Kent v. United States*, 383 U.S. 541, 554, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966); *Brown v. State*, 2017 WY 45, ¶ 22, 393 P.3d 1265, 1274 (Wyo. 2017). Further, the Wyoming Rules of Evidence do not apply to juvenile proceedings other than adjudicatory hearings. W.R.E. 1101(b)(3). Juvenile transfer hearings are not adjudicatory hearings, but determine which court is proper for the prosecution of the matter. Wyo. Stat. Ann. § 14-6-237(a) (LexisNexis 2017). As one court explained,

[the] constitutional guarantees arising from the question of admissibility of evidence at a trial on the merits do not apply to a preliminary jurisdictional hearing which simply determines whether the accused is to be tried in one court or another. Such a hearing is a preliminary proceeding to determine the propriety of transfer under the statutory criteria.... Since the result of a preliminary judicial proceeding as involved herein does not adjudicate the guilt of the accused, the type of permissible evidential material used by the court in reaching its conclusion is not circumscribed by the limited evidential rules applied at trial.

*In Interest of B.T.*, 145 N.J.Super. 268, 367 A.2d 887, 889 (1976); *see also State v. Woinarowicz*, 720 N.W.2d 635, 641 (N.D. 2006).

[¶14] The right to cross-examine witnesses at a juvenile transfer hearing is, however, a statutory right conferred by the Wyoming legislature. Wyo. Stat. Ann. § 14-6-223(b)(ii) (LexisNexis 2017). The Juvenile Justice Act provision governing transfer

hearings states that transfer hearings "shall be conducted in conformity with W.S. 14-6-222 through 14-6-224 except there shall be no jury." Wyo. Stat. Ann. § 14-6-237(a). Wyo. Stat. Ann. § 14-6-223(b)(ii) provides that a "party to any proceeding under this act is entitled to ... [c]onfront and cross-examine adverse witnesses." Thus, the question we must answer is whether the district court's admission of Detective Harper's testimony regarding the nature of the allegations against Mr. Sam violated Mr. Sam's statutory right to confront and cross-examine witnesses.

Statutory interpretation is a question of law which we review *de novo. Crain v. State*, 2009 WY 128, ¶ 8, 218 P.3d 934, 938 (Wyo. 2009). The plain, ordinary, and usual meaning of words used in a statute controls in the absence of clear statutory provisions to the contrary. *Id.* Where there is plain, unambiguous language used in a statute there is no room for construction, and a court may not look for and impose another meaning. *Id.* Where legislative intent is discernible a court should give effect to the "most likely, most reasonable, interpretation of the statute, given its design and purpose." *Rodriguez v. Casey*, 2002 WY 111, ¶ 20, 50 P.3d 323, 329 (Wyo. 2002).

*Adekale v. State*, 2015 WY 30, ¶ 12, 344 P.3d 761, 765 (Wyo. 2015).

[¶15] The State urges us to adopt a rule limiting this statutory right to confront witnesses at a juvenile transfer hearing to only those witnesses who appear at the hearing. We decline to do so. In most cases, the right to confront and cross-examine only the witness recounting the information of another person would serve little purpose. We will, however, look to the intent of the statute and its application in the context of juvenile transfer hearings. "[I]t is one of the surest indexes of a mature and developed jurisprudence ... to remember that the statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Adekale*, 2015 WY 30, ¶ 13, 344 P.3d at 765 (citations omitted).

[¶16] Detective Harper's testimony went to the first three factors, which concern the nature of the "alleged offense." Wyo. Stat. Ann. § 14-6-237(b)(i-iii). When it weighs the factors for transfer, the district court makes no determination of the truth of the alleged offenses; that is of course to be determined by a jury after a trial. Probable cause had already been determined at the preliminary hearing and is not a consideration at a transfer hearing. *See* Wyo. Stat. Ann. § 14-6-237(b). Courts have held that when a finding of probable cause to believe the defendant committed the crime is not required in a transfer hearing, the determination of whether to transfer a juvenile to adult court may be based upon hearsay and "need not be tested by cross-examination and confrontation." *Wolf v. State*, 99 Idaho 476, 583 P.2d 1011, 1015 (1978); *see also State v. Limoz*, 107 Hawai'i 259, 112 P.3d 745, 752 (Ct. App. 2005). A majority of jurisdictions, where probable cause that the juvenile committed the crime must be established during transfer hearings, allow hearsay testimony to establish probable cause.[2]

[¶17] The purpose of cross-examination is to test "the believability of a witness and the truth of his testimony." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). Because in a transfer hearing the district court only weighs the nature of the ***alleged*** offenses, and makes no determination of their truthfulness, cross-examination of those interviewed

2. *Compare In re T.F.*, 295 Ga.App. 417, 671 S.E.2d 887, 890 (2008) (hearsay evidence is admissible to prove probable cause in transfer hearing); *M.B.M. v. State*, 848 So.2d 283, 286 (Ala. Crim. App. 2002) (hearsay is admissible to show probable cause, but cannot be sole basis for finding probable cause); *In re D.O.*, 840 N.W.2d 641, 648-49 (N.D. 2013) (despite statute providing the right to cross-examine in transfer hearings and requirement that there are "reasonable grounds ... to believe that" the juvenile "committed the delinquent act," a detective's testimony regarding statements others made during his investigation is admissible during a transfer hearing) *with Matter of Darcy S.*, 123 N.M. 206, 936 P.2d 888, 892 (Ct. App. 1997) (probable cause finding cannot be based upon hearsay); *A.D. v. State*, 668 P.2d 840, 841 (Alaska Ct. App. 1983) (same); *see also Applicability of rules of evidence to juvenile transfer, waiver, or certification hearings*, 37 A.L.R.5th 703, § 3 (1996 & Cum. Supp.) (citing cases).

by a detective testifying regarding the nature of the charges has little "purpose or object to accomplish." Mr. Sam had the opportunity to confront and cross-examine Detective Harper regarding the nature of the allegations against him, and for purposes of the transfer hearing, the underlying witnesses were not "adverse witnesses." There was no need to evaluate the truth of the testimony of the underlying witnesses, and therefore no need to cross-examine them. Mr. Sam's statutory right to confront and cross-examine adverse witnesses was not violated when the district court allowed Detective Harper to testify regarding the allegations against Mr. Sam.

**B. The district court did not abuse its discretion when it assessed the rehabilitative facilities available to a juvenile**

■ [¶18] The district court's order accurately summarized the testimony of Dr. Wachtel, the forensic psychologist who testified that there was a "good likelihood" that Mr. Sam could be rehabilitated by his 21st birthday if he received appropriate services. The order also accurately summarized the testimony of Gary Gilmore, Superintendent of the Wyoming Boys' School, who testified that, although therapeutic and habilitative services would be available until a juvenile's 21st birthday, the Wyoming Boys' School could discharge a juvenile at its discretion at any time, and that the average stay for a juvenile in the school's violent offender program is 8 to 12 months. Mr. Sam takes issue with the conclusion of the district court that "There is no reason to believe that the Wyoming Boys' School, as good as it is, will succeed in a year or less to rehabilitate the Defendant, whose 'nature is avoidance,' according to Dr. Wachtel, and who has rebuffed 'a lot of attempts' to assist the Defendant in turning his life around." He suggests that this statement evidences the district court's misunderstanding of the jurisdictional limits of the juvenile court and consequent failure to consider available resources. Our reading of the entire order reveals that the district court understood very well the juris-

dictional limits of the juvenile court and properly considered the resources available; weighing all the factors, the district court found that it was unwilling to risk the possibility that Mr. Sam could be released within a year if he were tried as a juvenile.[3] The district court did not abuse its discretion in reaching that conclusion.

**C. The district court did not abuse its discretion when it weighed the likelihood of reasonable rehabilitation**

■ [¶19] Mr. Sam contends that he presented uncontested evidence that he was reasonably likely to be rehabilitated, and, furthermore, he argues that factor should outweigh the other six factors in Wyo. Stat. Ann. § 14-6-237(b). We find no support for the argument that any one of the seven factors should outweigh the others. Indeed, this Court has said that "Undue weight should not be given to any single factor." *JB*, 2013 WY 85, ¶ 16, 305 P.3d at 1142.

[¶20] Dr. Berry, who had counseled Mr. Sam in the past, did not opine regarding the likelihood of Mr. Sam's rehabilitation, but did express his belief that it was more likely to succeed in the juvenile justice environment than in the prison system. Dr. Wachtel, the forensic psychologist, said that there was a "good likelihood" he could be rehabilitated, but, as the district court noted, he also testified that:

> [Not] all juveniles can be rehabilitated, and that the age of the offender, the severity of the offender's actions, the offender's willingness to accept treatment and medications, and the offender's underlying mental health conditions all play a role in the offender's chance of successfully rehabilitating.

Unfortunately, there is a great deal of evidence regarding these factors that does not weigh in favor of predicting rehabilitation. Rebecca Campbell, a social worker/counselor for Laramie County School District No. 1, testified that while she worked with him, "he was very angry most of the time;" "he wasn't

---

3. We recognize that the issue of the time remaining for the juvenile system's therapeutic and rehabilitative services to be effective could become critical in the event of remand after appeal, which may be a factor in favor of granting immediate review of juvenile transfer decisions.

really open to counseling;" "he really had trouble with authority;" and he showed "continued disrespect." Mike Webster, the school resource officer at Central High School, testified regarding his several interactions with Mr. Sam, usually arising from violence on Mr. Sam's part. Kristen Siegal, assistant principal at Central High School, testified regarding Mr. Sam's fighting, name calling, and not wanting to follow the rules, and her recommendation that he be expelled. Mr. Sam's aggressive behavior continued after he was arrested. While in detention, he verbally threatened deputies, threatened to "stab somebody," and threatened and attempted to attack other juveniles. The district court considered this "long history of aggression, defiance and explosive outbursts," along with the fact that Mr. Sam "has generally refused to take his medication," and did not abuse its discretion when it found "no reasonable likelihood of rehabilitation for Mr. Sam within the juvenile court system, nor prospects for adequate protection of the public."

## II. Did the district court improperly instruct the jury?

[¶21] Mr. Sam raises a number of issues regarding the instructions provided to the jury. We find some instructional errors; however, they were not prejudicial either individually or cumulatively.

### A. Failure to remove Instruction No. 4

[¶22] Mr. Sam first argues that the district court erred when it failed to remove an instruction containing an error from the official jury instruction packet. Our review is for plain error because Mr. Sam did not object below. *Blevins v. State*, 2017 WY 43, ¶ 25, 393 P.3d 1249, 1255 (Wyo. 2017).

[¶23] On the second day of trial, prior to opening statements, the district court read initial instructions to the jury, including Instruction No. 4. It stated that "The elements of the crime of Aggravated Assault and Battery are the same as to each of the victims," and they include that the defendant "intentionally cause[d] or knowingly caused ... [b]odily injury to the named victim."

[¶24] Because 10 of the 12 counts of aggravated assault alleged that Mr. Sam had at-

tempted to cause bodily injury, not that he caused bodily injury, the State objected and pointed out that the instruction was wrong, and should have contained "caused or attempted to cause" language to correspond with the charges. Mr. Sam's attorney agreed with the objection. The district court then indicated that it would correct the instruction and that it would give an individual instruction corresponding with each count. Mr. Sam's counsel agreed to that approach. The entire exchange occurred in front of the jury. At the instruction conference, the district court again addressed Instruction No. 4 and the parties again agreed with the court's proposed course of action. When the final instructions were read to the jury, the court noted that the original Instruction No. 4 contained an error and that it had deliberately been removed from the jurors' notebooks.

[¶25] Mr. Sam agrees that the removal of Instruction No. 4 was proper, but argues that the district court erred when it left Instruction No. 4 in the official jury instruction packet as it appears in the record. He claims that this "contributed to the general level of confusion, contradiction and incorrectness of the jury instructions as a whole."

[¶26] We find that the district court's failure to remove Instruction No. 4 from the official packet did not violate an unequivocal rule of law and did not prejudice Mr. Sam. The jurors received their own correct set of instructions, omitting Instruction No. 4, and they heard the court's explanation of the error, so the risk of jury confusion was minimal. We presume that the jury follows the instructions given to them. *Harlow v. State*, 2003 WY 47, ¶ 56, 70 P.3d 179, 199 (Wyo. 2003). The district court's decision to leave the original Instruction No. 4 in the official court copy of the instructions served the purpose of preserving the record. The district court's failure to remove Instruction No. 4 from the official instruction packet was not plain error.

### B. Failure to define "attempt"

[¶27] As explained in the preceding section, 10 of the 12 aggravated assault counts alleged attempt to cause bodily injury.

While the jury was instructed that an attempt to cause bodily injury is an element of attempted aggravated assault, the district court did not define attempt. Mr. Sam now contends that such a definition should have been provided to the jury. No instruction defining attempt was proposed and no objection regarding the definition of attempt was raised during trial.

[¶28] Mr. Sam asserts that our review is for plain error, and normally, when no objection is made at trial, our review is for plain error. *Mendoza v. State*, 2013 WY 55, ¶ 15, 300 P.3d 487, 491 (Wyo. 2013). The State contends that our review must be for abuse of discretion because the issue was raised in a motion for new trial, at the district court's request. The district court heard arguments on the issue at the hearing and determined that no error occurred. We generally review the district court's decision on a motion for a new trial for abuse of discretion. *Garza v. State*, 2010 WY 64, ¶ 10, 231 P.3d 884, 888 (Wyo. 2010) (review of denial of motion for new trial is for abuse of discretion); *Lawson v. State*, 2010 WY 145, ¶ 19, 242 P.3d 993, 1000 (Wyo. 2010). In "addition to the standard of review for a ruling on a motion for new trial, we must apply the standard of review applicable to the claimed underlying error." *Mendoza*, 2013 WY 55, ¶ 9, 300 P.3d at 489 (citing *Hicks v. State*, 2008 WY 83, ¶ 30, 187 P.3d 877, 883 (Wyo. 2008) (acknowledging abuse of discretion standard for reviewing order on a motion for a new trial while applying de novo standard to claim of constitutional error in suppressing exculpatory evidence)). We therefore review for plain error.

[¶29] The definition of attempt was not provided in the jury instructions, thus the first prong of plain error is satisfied. We turn to the second prong and determine that no clear and unequivocal rule of law requires a definition of attempt in this case. *See Snow v. State*, 2009 WY 117, ¶ 13, 216 P.3d 505, 509 (Wyo. 2009) (setting forth elements of plain error). Mr. Sam was charged with violating Wyo. Stat. Ann. § 6-2-502(a)(ii) (LexisNexis 2017), which provides "[a] person is guilty of aggravated assault and battery if he ... [a]ttempts to cause, or intentionally or know-ingly causes bodily injury to another with a deadly weapon[.]" Mr. Sam argues that the general attempt statute definition of attempt should have been given to the jury. It states:

(a) A person is guilty of an attempt to commit a crime if:

(i) With the intent to commit the crime, he does any act which is a substantial step towards commission of the crime. A "substantial step" is conduct which is strongly corroborative of the firmness of the person's intention to complete the commission of the crime; or

(ii) He intentionally engages in conduct which would constitute the crime had the attendant circumstances been as the person believes them to be.

Wyo. Stat. Ann. § 6-1-301(a)(i) & (ii) (LexisNexis 2017).

[¶30] In *Cecil v. State*, 2015 WY 158, ¶ 12, 364 P.3d 1086, 1090 (Wyo. 2015), we considered whether the general attempt statute applied to aggravated assault charged under Wyo. Stat. Ann. § 6-2-502(a)(i), a different aggravated assault provision than the one at issue here. We held that because the legislature had specifically made an "attempt to cause serious bodily injury" a crime under § 6-2-502(a)(i), the general attempt statute, Wyo. Stat. Ann. § 6-1-301, did not apply and thus no attempt definition was necessary. *Cecil*, 2015 WY 158, ¶ 12, 364 P.3d at 1090. We explained, "[T]he general attempt statute is operative when applied to statutes where the legislature has not already spoken; and where the legislature has enacted a special statute making the attempt a crime, the special statute will prevail." *Id.* at ¶ 11, 364 P.3d at 1090 (citation omitted).

[¶31] The same analysis applies to aggravated assault charged under Wyo. Stat. Ann. § 6-2-502(a)(ii). Because the crime of aggravated assault under § 6-2-502(a)(ii) prohibits "[a]ttempts to cause ... bodily injury to another," the general attempt statute is inapplicable to the crimes charged. "A court need not give an instruction defining a term unless it has a technical legal meaning so different from its ordinary meaning that the jury, without further explanation, would misunderstand its import in relation to the factual

circumstances." *Butz v. State*, 2007 WY 152, ¶ 19, 167 P.3d 650, 655 (Wyo. 2007) (citation omitted), *abrogated on other grounds by Granzer v. State*, 2008 WY 118, ¶¶ 18-19, 193 P.3d 266, 271-72 (Wyo. 2008). Because the technical legal meaning of "attempt" as set forth in Wyo. Stat. Ann. § 6-1-301 is not applicable to § 6-2-502(a)(ii), the district court properly omitted an instruction defining the term. *See Cecil*, 2015 WY 158, ¶ 14, 364 P.3d at 1090. Mr. Sam has failed to establish that either plain error or an abuse of discretion occurred when the district court failed to give a definition of attempt.

## C. Definition of "malice"

[¶32] Mr. Sam next contends that the jury instruction defining malice as it pertained to first-degree murder was erroneous. No objection was made to this instruction during the trial. However, this issue was the subject of Mr. Sam's motion for new trial, based upon *Johnson v. State*, 2015 WY 118, 356 P.3d 767 (Wyo. 2015), which was issued by this Court nine days after the jury returned its verdict in Mr. Sam's case. As we explained in the preceding section, we review the district court's decision on a motion for a new trial for abuse of discretion, *Lawson*, 2010 WY 145, ¶ 19, 242 P.3d at 1000, and we also "apply the standard of review applicable to the claimed underlying error." *Mendoza*, 2013 WY 55, ¶ 9, 300 P.3d at 489.

[¶33] In *Wilkerson v. State*, 2014 WY 136, 336 P.3d 1188 (Wyo. 2014), we addressed the proper definition of malice for second-degree murder. We recognized that our precedent did not provide an adequate distinction between second-degree murder and manslaughter and that to show the proper malicious intent for second-degree murder, the State must "show that the defendant acted recklessly under circumstances manifesting an extreme indifference to the value of human life." *Id.* at ¶ 27, 336 P.3d at 1200. We concluded that in the context of second-degree murder, a "jury must be instructed that 'malice' means that the act constituting the offense was done recklessly under circumstances manifesting an extreme indifference to the value of human life, *and* that the act

was done without legal justification or excuse." *Id.* (emphasis in original).

[¶34] In *Johnson*, we addressed the question of whether the jury was properly instructed on the definition of malice as it related to Johnson's attempted first-degree murder charge. 2015 WY 118, ¶ 2, 356 P.3d at 769. The jury was instructed that in regard to attempted first-degree murder:

The term "malice" means that the act(s) constituting the offense charged was/were done intentionally, without legal justification or excuse or that the act(s) was/were done in such a manner as to indicate hatred, ill will, or hostility towards another. "Maliciously" means acting in the state of mind in which an intentional act is done without legal justification or excuse. The term "maliciously" conveys the meaning of hatred, ill will, or hostility toward another.

*Id.* at ¶ 14, 356 P.3d at 771. Johnson argued that this definition of malice was incorrect, contending that the definition of malice should have aligned with the recently reformulated definition of malice articulated in *Wilkerson*. *Johnson*, 2015 WY 118, ¶ 15, 356 P.3d at 771-72 (citing *Wilkerson*, 2014 WY 136, ¶ 27, 336 P.3d at 1200). We held that the *Wilkerson* malice definition was only applicable to cases of second-degree murder, and not to cases of first-degree murder, and that the malice instruction given was erroneous as it pertained to first-degree murder. *Johnson*, 2015 WY 118, ¶¶ 18-19, 356 P.3d at 772-73. To properly instruct in first-degree murder cases, the instructions must state "that 'malice' means the defendant acted intentionally without legal justification or excuse *and* with hatred, ill will or hostility." *Id.* at ¶ 19, 356 P.3d at 772 (emphasis in original).

[¶35] Here, Instruction No. 6 defined "premeditated malice:"

"Premeditated malice" means that the Defendant thought about and considered the idea of killing before the act which caused death was committed, and that the act which caused death was done with intent to kill and without legal justification or excuse.

The district court also provided the jury with the following definition of malice in Instruction No. 11:

The term malice means that the act constituting the offense charged was done recklessly under circumstances manifesting an extreme indifference to the value of human life and without legal justification or excuse.

[¶36] There is no dispute that Instruction No. 11 complied with *Wilkerson* and properly instructed the jury regarding malice required for second-degree murder, a lesser included offense, in Mr. Sam's case. However, the district court did not provide a proper instruction regarding malice required for first-degree murder. Instruction No. 6 did contain a definition of malice that included the requirement that the defendant act without legal justification or excuse, but it was not a correct statement of the law because it failed to include the requirement that Mr. Sam acted with "hatred, ill-will, or hostility." *Johnson*, 2015 WY 118, ¶ 19, 356 P.3d at 772; *see also Miller v. State*, 2015 WY 68, ¶ 8, 350 P.3d 264, 266 (Wyo. 2015) (incorrect malice instruction did not cause prejudice where facts support finding all elements of crime). The question is whether the error requires the reversal of Mr. Sam's conviction.

[¶37] In determining that a new trial was not warranted on the basis of the malice instruction, the district court concluded that the record contained evidence which "clearly supports" a finding that Mr. Sam acted with "hatred, ill will or hostility." After our review of all the evidence, we agree. Mr. Sam commented to his friend that he was going to kill someone, emerged from behind the trees and shot into the crowd, and after Tyler Burns fell to the ground, shot Mr. Burns in the head at close range. While Mr. Sam may not have known Mr. Burns, his ill will and hostility toward him are demonstrated by his actions—Mr. Sam looked an already injured Mr. Burns in the eye, ignored his pleas for life, and fired a bullet directly into his brain. This cannot be described as anything less than acting with hatred, ill will, or hostility. Mr. Sam was not prejudiced by the erroneous malice definition and cannot establish plain error. The district court did not abuse its discretion in failing to grant a new trial.

### D. Definition of "recklessly"

[¶38] Instruction No. 12 provided the following definition of "recklessly":

"Recklessly" is defined as the following conduct: A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that the harm he is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

This instruction, which was proposed by Mr. Sam's attorney, comes from Wyo. Stat. Ann. § 6-1-104(a)(ix), which provides a general definition of "recklessly" for the criminal code. Mr. Sam argues that the district court erred when it used this definition instead of the definition discussed in *Wilkerson*, 2014 WY 136, 336 P.3d 1188.

[¶39] The term "reckless" appears in the context of the second-degree murder malice definition. In *Wilkerson*, we instructed that in "order to demonstrate malicious intent [for second-degree murder], the State must show a heightened form of recklessness as compared to that required for manslaughter; i.e., the State must show that the defendant acted recklessly under circumstances manifesting an extreme indifference to the value of human life." 2014 WY 136, ¶ 27, 336 P.3d at 1200. Instruction No. 12 did not define this "heightened form" of recklessness and, therefore, it was erroneous.

[¶40] We apply the doctrine of invited error which "prohibits a party from raising error on appeal that was induced by the party's own actions." *Bromley v. State*, 2007 WY 20, ¶ 35, 150 P.3d 1202, 1213 (Wyo. 2007) (applying invited error to jury instruction proposed by appellant). "As applied to jury instructions, the invited error doctrine provides that use of an instruction proposed by the appellant may not be grounds for reversal unless the instruction was necessarily prejudicial." *Id.*

[¶41] The definition of "reckless" provided to the jury, though erroneous, was not "necessarily prejudicial" because the jury found Mr. Sam guilty of first-degree murder,

and never reached the question of second-degree murder, a lesser included offense.

> When a greater and lesser offense are charged to the jury, the proper course is to tell the jury to consider first the greater offense, and to move on to consideration of the lesser offense only if they have some reasonable doubt as to the guilt of the greater offense. A jury that finds guilt as to the greater offense does not enter a verdict concerning guilt of the lesser offense. The reason for this absence of consideration is not any inconsistency between the offenses. It rather reflects the very 'inclusion' that defines the lesser offense as one 'included' in the greater.

*Hawes v. State*, 2014 WY 127, ¶ 16, 335 P.3d 1073, 1078 (Wyo. 2014) (quoting *Janpol v. State*, 2008 WY 21, ¶ 9, 178 P.3d 396, 400-01 (Wyo. 2008), *abrogated on other grounds by Shull v. State*, 2017 WY 14, 388 P.3d 763 (Wyo. 2017)). This course was followed here: the jury was instructed that if it did not find "beyond a reasonable doubt that the defendant is guilty of [first-degree murder], he may, however, be found guilty of any lesser offense" and first-degree murder "includes the lesser offense of Murder in the Second Degree. . . ." The jury found Mr. Sam guilty of first-degree murder, and thus had no occasion to consider the lesser included offense of second-degree murder. Therefore, Mr. Sam has not met his burden of showing the erroneous "reckless" instruction was necessarily prejudicial.

### E. Inference of malice

[¶42] The district court gave the State's proposed instruction on inference of malice:

> The element of malice may be inferred by the jury from the use of a deadly weapon in a dangerous manner if the facts and circumstances indicate such. Malice may also be inferred from all of the other facts and circumstances surrounding an alleged event.

As authority, the State cited *Eckert v. State*, 680 P.2d 478, 483 (Wyo. 1984), a case in which we approved the same instruction. Mr. Sam raises two arguments against this instruction. First, he argues that since *Wilker-son*, 2014 WY 136, 336 P.3d 1188 and *Johnson*, 2015 WY 118, ¶ 19, 356 P.3d at 772 ("malice requires proof of an intentional act done without legal justification or excuse *and* hatred, ill will or hostility," instead of *or*), we have a heightened level of hatred or ill will for first-degree murder, and therefore a presumption of malice from use of a deadly weapon is no longer correct. This argument goes hand-in-hand with Mr. Sam's second argument, that the presumption instruction does not comply with Rule 303(c) of the Wyoming Rules of Evidence, which provides:

> *Instructing the jury.*—Whenever the existence of a presumed fact against the accused is submitted to the jury, the court shall instruct the jury that it may regard the basic facts as sufficient evidence of the presumed fact but is not required to do so. In addition, if the presumed fact establishes guilt or is an element of the offense or negatives a defense, the court shall instruct the jury that its existence, on all the evidence, must be proved beyond a reasonable doubt.

[¶43] In *Hereford v. State*, 2015 WY 17, ¶ 19, 342 P.3d 1201, 1206 (Wyo. 2015) (internal citation omitted), we addressed the standard for permissive presumptions, explaining that "[a] permissive presumption or inference will satisfy the constitution 'so long as the connection between the inferred fact and the proven fact is one that reason and common sense justify in the light of the facts in a particular case.'" We held that the instruction given in that case satisfied this standard, and W.R.E. 303(c), though we urged use of the word "infer" rather than "presume," and we recommended the following language for an inference of malice instruction:

> You are instructed that you may, but are not required to, infer malice from the use of a deadly weapon. The existence of malice, as well as each and every element of the charge of murder in the second degree, must be proved beyond a reasonable doubt.

*Id.* at ¶ 22, 342 P.3d at 1207. Although we discussed *Eckert* in *Hereford*, we did not address the adequacy of the instruction given there, and we noted that "we subsequently reaffirmed that '[i]f the facts and circum-

stances allow, then malice may be inferred by the use of a deadly weapon.' " *Id.* at ¶ 25, 342 P.3d at 1208 (quoting *Braley v. State*, 741 P.2d 1061, 1069 (Wyo. 1987)).

[¶44] Applying our plain error standard of review, we cannot say that use of the *Eckert* instruction on inference of malice violated clearly established law. However, the instruction we recommended in *Hereford* more faithfully complies with W.R.E. 303(c), because it includes the specific language that the jury is "not required" to infer malice and the reminder of the burden to prove each element beyond a reasonable doubt. These disclaimers are particularly important in light of the new conjunctive rather than disjunctive standard for malice we adopted in *Johnson*. Henceforth this should be considered clearly established law. The *Hereford* inference of malice instruction should be given, not the *Eckert* instruction.

## F. Self-defense instructions

[¶45] Mr. Sam's theory of the case was that he acted in self-defense. "The right to defend oneself and the amount and type of force which may be used ∴.. depend upon what is reasonably necessary under the circumstances." *Mendoza*, 2013 WY 55, ¶ 16, 300 P.3d at 492. "To justify taking the life of another, it must reasonably appear to the defendant that he was in great peril of suffering death or serious bodily injury at the hands of the deceased and there must have been no other reasonable means to avoid the killing." *Drennen v. State*, 2013 WY 118, ¶ 22, 311 P.3d 116, 124 (Wyo. 2013). When a defendant asserts a defense of self-defense, he "has an initial burden of making a prima facie case that he acted in self-defense; however, once that minimal burden is satisfied, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, and the jury must be instructed accordingly." *Id.* at ¶ 22, 311 P.3d

at 124-25 (citing *Small v. State*, 689 P.2d 420, 423 (Wyo. 1984); *Olsen v. State*, 2003 WY 46, ¶ 144 n.12, 67 P.3d 536, 589, n.12 (Wyo. 2003)).

[¶46] We assume that the district court found Mr. Sam had established a prima facie case that he acted in self-defense because it summarily denied the State's Motion in Limine Regarding Defense of Self-Defense and gave a series of jury instructions pertaining to self-defense. Mr. Sam argues that the self-defense instructions defining an aggressor, describing the duty to retreat, and the failure to give an instruction on perceived threat were erroneous.[4] Although Mr. Sam does not specify whether he raises this issue as to some or all of the charges, we recognize that self-defense can be applicable to aggravated assault as well as murder. *See Mendoza*, 2013 WY 55, ¶ 12, 300 P.3d at 490-91 (applying self-defense analysis to aggravated assault).

[¶47] Because our analysis requires we consider instructions as a whole, *Drennen*, 2013 WY 118, ¶ 20, 311 P.3d at 124, we examine the alleged erroneous instructions in the context of all instructions given regarding self-defense. The district court gave the following self-defense instructions:

### Instruction No. 36

Before the defendant may be convicted of any crime, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense.

### Instruction No. 37

The right of self-defense exists only as long as the threatened danger would appear to exist to a reasonable person in the defendant's position. When the danger would no longer appear to exist to a reasonably prudent person, the right to use force in self-defense ends.

### Instruction No. 38

4. Our challenge in analyzing the objections to these instructions is in grasping how self-defense enters into this picture in the first place, when we have a young man who obtained a gun and expressed his intention to kill someone earlier in the day, incited a fight by vandalizing a car, set up an ambush, and then shot at a group of youths who had come for a rumble. However,

this was Mr. Sam's theory of the case, and the district court gave him the benefit of the doubt by giving the instructions. *See James v. State*, 2015 WY 83, ¶ 18, 357 P.3d 101, 105 (Wyo. 2015) ("Due process requires the trial court to give a correct instruction to the jury that details the defendant's theory of the case." (internal citation omitted)).

One who has reasonable grounds to believe that another will attack him, and that the anticipated attack will be of such a character as to endanger his life of limb, or to cause him serious bodily harm, has a right to arm himself for the purpose of resisting such an attack.

Instruction No. 39

Generally, the right to use self-defense is not available to an aggressor who provokes the conflict. However, if one provokes a conflict but thereafter withdraws in good faith and informs the adversary by words or actions of the desire to end the conflict and is thereafter pursued, that person then has the same right of self-defense as any other person. The person is justified in using force to the same extent that any other person would be who was acting in self-defense.

Instruction No. 40

In order to be considered an aggressor, a person must engage in some sort of physical aggression or communicate a threat of imminent use of deadly force.

Instruction No. 41

Even if the defendant had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, the defendant was justified in using deadly force to repel the danger only if he retreated as far as he safely could do before using deadly force. The law requires a person to retreat rather than to take the life of an adversary if there was a convenient mode of retreat without increasing his actual or apparent peril. To excuse a failure to retreat, it is necessary that the defendant's peril would be increased, or that it reasonably appeared that it would be increased, by retreat. If you find that the defendant could have safely retreated but failed to do so, the defendant cannot rely on the justification of self-defense.

Instruction No. 42

The right of self-defense ceases to exist when there is no longer any apparent danger of further violence on the part of an assailant. Thus where a person is attacked under circumstances which justify the exercise of the right of self-defense, and

thereafter he uses such force upon an attacker incapable of inflicting further injuries, the law of self-defense then ceases to work in favor of the person attacked.

### 1. Aggressor instructions

[¶48] Mr. Sam first takes issue with Instruction Nos. 39 and 40, which deal with the loss of the right of self-defense when one is an "aggressor." He argues that those instructions were improperly given because there "was no evidentiary basis for any argument that [he] was a pre-existing aggressor." Because Mr. Sam did not object to these instructions below, we apply a plain error analysis. The first element of the plain error standard is satisfied here because the record clearly reflects the instructions that were given and the alleged error. The second plain error element requires a showing of a violation of a clear and unequivocal rule of law. In order to prevail, Mr. Sam must demonstrate that there is a clear rule of law requiring the district court to refrain from instructing the jury about the law regarding an "aggressor" under these facts. *See Mendoza*, 2013 WY 55, ¶ 15, 300 P.3d at 491.

[¶49] In *Drennen*, we concluded "that, at least in the context of homicide, some sort of physical aggression or a threat of imminent use of deadly force is required before a person will be considered an aggressor." *Drennen*, 2013 WY 118, ¶ 34, 311 P.3d at 128. Mr. Sam's claim of self-defense is "based upon his perception of imminent danger from the group of people coming toward him in the circumstances." He argues that the group was "not coming toward him as a result of his having attacked them or threatened them." He contends that the instruction was in direct contravention of the *Drennen* holding that verbal confrontation is insufficient to make a person an initial aggressor in a homicide case.

[¶50] The State takes the position that at the very least, Mr. Sam's trip to the movie theater and vandalism of the car qualify as acts of physical aggression rendering Mr. Sam the aggressor. We agree. Further, with respect to the murder charge, by the time he approached his victim who was injured and

on the ground, immediately prior to firing the fatal shot, Mr. Sam had committed physical acts of aggression—stepping out from behind the trees and shooting at the crowd—and from that time on, he could be considered an obvious aggressor. Mr. Sam has not demonstrated that giving the aggressor instructions violated a clear rule of law and thus has not established plain error.

### 2. Duty to retreat

[¶51] Mr. Sam next complains that the duty to retreat instruction (Instruction No. 41) is an erroneous statement of the law. He did not object to that instruction below, thus our review is for plain error. Mr. Sam has satisfied the first element of the plain error standard—the record clearly reflects Instruction No. 41 and the alleged error. The second plain error element requires a showing that Instruction No. 41 violated a clear rule of law. *See Mendoza*, 2013 WY 55, ¶ 15, 300 P.3d at 491.

[¶52] Instruction No. 41 informed the jury that a defendant is required to retreat before using deadly force. In *Drennen*, we considered an instruction identical to Instruction No. 41:

> Even if the defendant had reasonable ground[s] to believe and actually did believe that he was in imminent danger of death or serious bodily harm, the defendant was justified in using deadly force to repel the danger only if he retreated as far as he safely could do before using deadly force. The law requires a person to retreat rather than to take the life of an adversary if there was a convenient mode of retreat without increasing his actual or apparent peril. To excuse a failure to retreat, it is necessary that the defendant's peril would be increased, or that it reasonably appeared that it would be increased, by retreat. If you find that the defendant could have safely retreated but failed to do so, the defendant cannot rely on the justification of self-defense.

*Id.*, 2013 WY 118, ¶ 37, 311 P.3d at 129.[5] We held that this duty to retreat instruction was wrong because unless the jury finds that the defendant is the aggressor, the defendant does not have an absolute duty to retreat before self-defense will be recognized. *Id.* at ¶ 39, 311 P.3d at 129; *see also Haire v. State*, 2017 WY 48, ¶ 35, 393 P.3d 1304, 1313 (Wyo. 2017). This was a clear and unequivocal rule of law by the time this case was tried.[6]

[¶53] We find that giving Instruction No. 41 was a clear transgression of the rule of law set forth in *Drennen*, where we explained the law regarding a defendant's right to self-defense in homicide cases. Depending on the evidence presented, "the district court will determine whether the defendant has made a prima facie case that the deceased was the aggressor." *Drennen*, 2013 WY 118, ¶ 39, 311 P.3d at 129. If the defendant meets this burden, the district court "must instruct the jury on the legal definition of 'aggressor.'" *Id.* "The jury should be instructed that if it determines the defendant was the aggressor, he had a duty to withdraw or retreat before he could claim the right to self-defense." *Id.*

> In cases where the evidence establishes, as a matter of law, the defendant was not the aggressor, the jury should not be charged that he had an absolute duty to retreat. In all cases, the jury should be instructed that the defendant was justified in using deadly force only if necessary; consequently, he must consider reasonable alternatives, which may include retreat, before using deadly force.

*Id.*; *see also Haire*, 2017 WY 48, ¶¶ 36-37, 393 P.3d at 1313-14.

[¶54] The appropriate instruction in this case would have been that, generally, a defendant is entitled to use deadly force to defend himself only if necessary, and he must consider reasonable alternatives, including retreat. The jury also should have been instructed that if it determined the defendant

---

5. This instruction mirrors instruction No. 8.08 in the 2014 Wyoming Criminal Pattern Jury Instructions. We use this opportunity to caution practitioners and the courts that not all instructions found in the Criminal Pattern Jury Instructions are correct statements of the law.

6. *Drennen* was decided on October 1, 2013. This case was tried almost two years later, in August of 2015.

to be the aggressor, he had an absolute duty to retreat before he could assert the defense of self-defense. These instructions were not given, so we turn to the final element of the plain error analysis.

[¶55] The last element of plain error requires the appellant to establish that the error adversely affected a substantial right, resulting in material prejudice. *Mendoza*, 2013 WY 55, ¶ 11, 300 P.3d at 490. "To establish material prejudice, an appellant 'must show a reasonable probability that [he] would have received a more favorable verdict in the absence of the error.'" *Cecil*, 2015 WY 158, ¶ 10, 364 P.3d at 1089 (quoting *Pendleton v. State*, 2008 WY 36, ¶ 11, 180 P.3d 212, 216 (Wyo. 2008)). Mr. Sam has not met this burden.

[¶56] Had the district court given the proper instructions, the jury would not have received Instruction No. 41, which misstates the law in that not all defendants have a duty to retreat before asserting self-defense. However, the jury would have been instructed that if it found that Mr. Sam was the aggressor, he had a duty to retreat prior to asserting the defense. As we explained, *see supra* ¶ 50, even if Mr. Sam were not considered the aggressor until he stepped out from behind the trees and fired the shots that took his victim down, by the time he walked up to his wounded victim lying on the on ground, he was the aggressor and, as such, had a duty to retreat before using deadly force. Unfortunately, he elected to fire the fatal shot instead. There is no reasonable probability that Mr. Sam would have received a more favorable verdict in the absence of the error.

### 3. Perceived threat

[¶57] The next self-defense instruction error claimed by Mr. Sam concerns the district court's rejection of his proposed instruction on perceived threat. That instruction provided:

> To justify acting in self-defense, it is not necessary that the danger was real, or that the danger was impending and immediate, so long as the defendant had reasonable cause to believe and did believe these facts. If these two requirements are met, acting in self-defense is justified even though there is no intention on the part of the other person to do the defendant harm, nor any impending and immediate danger, nor the actual necessity for acting in self-defense.

The district court declined to give this instruction, stating that "to the extent it even remains an accurate statement of the law, [it is] inapplicable to the facts here, and would lead to jury confusion." We review the district court's refusal to give a proposed instruction for abuse of discretion. *Knospler v. State*, 2016 WY 1, ¶ 22, 366 P.3d 479, 485 (Wyo. 2016).

[¶58] The offered instruction contains a valid statement of the law—it instructs that before he can assert a defense of self-defense, the defendant must believe he is in imminent danger and his belief must be a reasonable one, even if the danger is not present or immediate. If a defendant had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm from which the defendant could be saved only by using deadly force, the defendant had the right to use deadly force in self-defense. *Drennen*, 2013 WY 118, ¶ 35, 311 P.3d at 128.

[¶59] The jury was properly instructed that to assert a claim of self-defense, it is sufficient that Mr. Sam reasonably perceived the danger, even if the danger was not real. Instruction No. 37 provides that the right to self-defense exists as long as "the threatened danger would appear to exist to a reasonable person in the defendant's position." Instruction No. 38 refers to "reasonable grounds to believe that another will attack him." These instructions both indicate that the defendant need only perceive a threat and that that perception must be reasonable. While the proposed instruction was perhaps a more precise statement of the kind of threat that may allow self-defense, the instructions as a whole encompassed the concept. We give the district court broad discretion in instructing the jury, and we will not reverse if the instructions correctly state the law and collectively cover the relevant issue. *Drennen*, 2013 WY 118, ¶ 20, 311 P.3d at 124; *Marfil v. State*, 2016 WY 12, ¶ 17, 366 P.3d

969, 973 (Wyo. 2016). The district court's rejection of this instruction was not an abuse of discretion.

[¶60] In asserting his argument regarding the rejected perceived threat instruction, Mr. Sam also contends that a general self-defense instruction ought to have been given. He argues that a general instruction like the one quoted in *Drennen*, 2013 WY 118, ¶ 35, 311 P.3d at 128, and Wyoming Criminal Pattern Jury Instruction No. 8.02 would have provided the "full context of the law." We agree that it would have been preferable for the district court to have provided such an instruction; however, neither party offered it. The instructions given, when viewed as a whole, sufficiently informed the jury of Mr. Sam's defense of self-defense and the law regarding that defense given the facts of this case. "[A]s long as the instructions correctly state the law and the entire charge covers the relevant issues, reversible error will not be found." *Farmer v. State*, 2005 WY 162, ¶ 20, 124 P.3d 699, 706 (Wyo. 2005) (citation omitted). The failure to provide a general instruction regarding self-defense was not plain error.

[¶61] Finally, Mr. Sam argues that the cumulative effect of the multiple jury instruction errors "rendered the entire jury instruction process so confused and incorrect as to deny him a fair trial." "In reviewing for cumulative error, we consider only those matters which we concluded constitute error." *Watts v. State*, 2016 WY 40, ¶ 23, 370 P.3d 104, 112 (Wyo. 2016). Moreover, a series of harmless or non-prejudicial errors will only be cause for reversal where the accumulated effect constitutes prejudice and the conduct of the trial is other than fair and impartial. *Id.*; *Eaton v. State*, 2008 WY 97, ¶ 105, 192 P.3d 36, 79 (Wyo. 2008). In this instance, any errors found in the jury instructions were not prejudicial and neither was their cumulative effect. We conclude that Mr. Sam's trial was fair and impartial.

### III. Did the prosecutor commit misconduct when he made victim impact arguments in his closing argument?

[¶62] In closing argument, the prosecutor stated:

Ladies and gentlemen, there comes a time when we must each write our own stories. The Defendant must now write his, but Tyler Burns cannot. His hand has been stilled. His voice silenced. His story remains unfinished, interrupted, but the Defendant is no longer in control of Tyler's story. That role now falls to you good people.

You are now the voice of Tyler Burns. Cry out where he cannot. Tell us of his pain. Let us hear the anguish of his final desperate plea to live, to see one more sunrise, to love.

[DEFENSE COUNSEL]: Objection, Your Honor. He is trying to inflame the passions of the jury. This is not evidence. It's not even argument about the evidence.

THE COURT: [Prosecutor]—

[PROSECUTOR]: Your Honor, I just have a few more comments, and I'm done.

THE COURT: He may continue at this juncture. I believe it's fair argument up to that point. Go ahead, counsel.

[PROSECUTOR]: Thank you.

Let us hear the anguish of his final desperate plea to laugh, to grow old with the warmth of sweet memories. Don't allow the Defendant to be the author of Tyler Burns' story, because after all, ladies and gentlemen, the pen is in your hands. Thank you.

[¶63] The State concedes that these comments were improper. Indeed, we have clearly stated that "victim impact argument is inappropriate during the guilt phase of a criminal prosecution and prosecutors should not make arguments calculated to inflame the passions or prejudices of the jury." *Haynes v. State*, 2008 WY 75, ¶ 38, 186 P.3d 1204, 1213 (Wyo. 2008) (citing *Whitney v. State*, 2004 WY 118, ¶ 89, 99 P.3d 457, 487 (Wyo. 2004)). We are once again faced with the seeming contradiction of a prosecutor who apparently felt the need to engage in prosecutorial misconduct to get a conviction, and the State arguing on appeal that the evidence against the defendant was so strong that the error was harmless. To resolve this dilemma, we apply our well-established standard of review.

[¶64] Mr. Sam contends that the prosecutor's misconduct deprived him of the constitutional right to a fair trial, and he urges us to apply a *Chapman* constitutional error standard, requiring the State to demonstrate harmlessness beyond a reasonable doubt. *See Vigil v. State*, 2004 WY 110, ¶ 21, 98 P.3d 172, 180 (Wyo. 2004) (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). We decline to expand the definition of constitutional error to apply to any allegation of misconduct which might be argued to have resulted in an unfair trial. Rather, the constitutional error standard is applied when there has been a violation of a specific constitutional provision, such as in *Vigil*, where we found the defendant had been deprived of his constitutional rights under the confrontation clause. *Vigil*, 2004 WY 110, ¶ 22, 98 P.3d at 180; *see also Chapman*, 386 U.S. at 21, 87 S.Ct. at 826-27 (constitutional error when defendants were punished for exercising their Fifth and Fourteenth Amendment right to be silent).

[¶65] Here, Mr. Sam's counsel objected to the improper statements, so we apply the harmless error standard:

> Whether such misconduct has been reviewed on the basis of harmless error, W.R.Cr.P. 52(a) and W.R.A.P. 9.04, or on the basis of plain error, W.R.Cr.P. 52(b) and W.R.A.P. 9.05, this Court has focused on whether such error … affected the accused's "substantial rights." The accused's right to a fair trial is a substantial right. Wyo. Const. art. 1, §§ 6, 9, and 10; *and see, e.g., Jones v. State*, 580 P.2d 1150, 1154 (Wyo. 1978). Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused.

*White v. State*, 2003 WY 163, ¶ 7, 80 P.3d 642, 646 (Wyo. 2003) (quoting *Earll v. State*, 2001 WY 66, ¶ 9, 29 P.3d 787, 789 (Wyo. 2001)). "To demonstrate harmful error, the defendant must show prejudice under 'circumstances which manifest in-

herent unfairness and injustice or conduct which offends the public sense of fair play.' " *Phillips v. State*, 2007 WY 25, ¶ 8, 151 P.3d 1131, 1134 (Wyo. 2007) (quoting *Condra v. State*, 2004 WY 131, ¶ 7, 100 P.3d 386, 389 (Wyo. 2004)). *McGinn v. State*, 2015 WY 140, ¶ 13, 361 P.3d 295, 299 (Wyo. 2015).

[¶66] In *McGinn*, we discussed five factors this Court balances to determine whether prosecutorial misconduct was harmless.

> 1) the severity and pervasiveness of the misconduct; 2) the significance of the misconduct to the central issues in the case; 3) the strength of the State's evidence; 4) the use of cautionary instructions or other curative measures; and 5) the extent to which the defense invited the misconduct.

*Id.* at ¶ 16, 361 P.3d at 299-300. We find that the misconduct, while severe, was not pervasive, and it was not significant to the central issue in the case. The State's evidence that Mr. Sam killed Tyler Burns purposely and with premeditated malice was overwhelming. Even putting aside the initial encounter, the stark and undisputed facts at trial were that, after Mr. Sam shot Tyler Burns the first time, he walked up to him as he was kneeling on the ground, injured and defenseless, and shot him in the head. There were no cautionary instructions, and the defense did not invite the misconduct. But the strength of the State's case outweighs all the other factors. We find that the error was harmless.

### IV. There was sufficient evidence to support Mr. Sam's convictions for aggravated assault, even though there was no evidence that he intended to harm any particular individual

[¶67] Mr. Sam argues there was insufficient evidence to sustain the intent element on the ten charges of attempted aggravated assault and battery of the youths who were not shot. When we review a sufficiency of the evidence challenge,

> [w]e do not consider "whether or not the evidence was sufficient to establish guilt beyond a reasonable doubt, but [instead] whether or not the evidence could reasonably support such a finding by the factfin-

der." "We will not reweigh the evidence nor will we re-examine the credibility of the witnesses." We review the sufficiency of the evidence "from this perspective because we defer to the jury as the factfinder and assume they believed only the evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt."

*Blevins*, 2017 WY 43, ¶ 7, 393 P.3d at 1251 (internal citations omitted).

[¶68] Mr. Sam argues that when he shot into the crowd of youths, there was no evidence that he had animosity toward any of them, and therefore there was insufficient evidence that he had the specific intent to strike any particular individual. The State contends that aggravated assault is a general intent crime, and therefore it was "not required to prove that Sam had a particularized intent to harm each alleged victim." We find that attempted aggravated assault is a specific intent crime; however, the specificity requires the attempt to assault a person, not a particular individual.

[¶69] In *Cox v. State*, 829 P.2d 1183, 1185-86 (Wyo. 1992), we concluded that aggravated assault as defined by Wyo. Stat. Ann. § 6-2-502(a)(iii) is a general intent crime. We have not considered whether aggravated assault as defined by § 6-2-502(a)(ii) is a general or specific intent crime.

When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence the fact that the defendant intended to do the proscribed act makes that crime a general criminal intent offense. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.

*Cox*, 829 P.2d at 1185 (citations and internal quotation marks omitted).

[¶70] "[O]nly those crimes which refer to an intent to do a further act or achieve a future consequence are specific intent crimes." *Id.* In *Cox*, we illustrated the distinction, providing examples of specific intent crimes:

Examples of an intent to commit a further act include Wyoming's burglary statute, which states that a person is guilty if, "without authority, he enters or remains in a building . . . *with intent to commit larceny or a felony therein.*" Wyo. Stat. § 6-3-301(a) (1988) (emphasis added). . . . Similarly, Wyo. Stat. § 35-7-1031(a) (1988) makes it unlawful to possess a controlled substance "*with intent to manufacture or deliver.*" (Emphasis added.)

*Id.*

[¶71] We have held that the crime of attempt as defined by the general attempt statute, Wyo. Stat. Ann. § 6-1-301, is a crime of specific intent. *See Compton v. State*, 931 P.2d 936, 940 (Wyo. 1997) (crime of attempted first-degree sexual assault is a specific intent crime). In *Reilly v. State*, 2002 WY 156, ¶ 8, 55 P.3d 1259, 1262 (Wyo. 2002), *abrogated on other grounds by Granzer v. State*, 2008 WY 118, 193 P.3d 266 (Wyo. 2008), we explained that "an 'attempt' is a 'specific intent' crime in that the attempt statute requires that one act with the intent to commit the object crime." In *Reilly*, we went on to explain that it is not "legally or logically impossible for a person to attempt a general intent crime." *Id.* at ¶ 12, 55 P.3d at 1263.

[¶72] Section 6-2-502(a)(ii) provides that a "person is guilty of aggravated assault and battery if he [a]ttempts to cause, or intentionally or knowingly causes bodily injury to another with a deadly weapon[.]" The attempt portion of this statute requires a person to act with the intent to commit a further act, the act of causing bodily injury to another with a deadly weapon. Thus, it is a specific intent crime. *See Walter v. State*, 811 P.2d 716, 720 (Wyo. 1991); *Garcia v. State*, 777 P.2d 1091, 1095-96 (Wyo. 1989). Mr. Sam argues that because aggravated assault under § 6-2-502(a)(ii) is a specific intent crime, the State needed to show that Sam attempted to cause bodily injury to each of the individual victims alleged in the charges against him. We have explained what is required to prove specific intent:

[A]lthough the law presumes an individual to generally intend the natural conse-

quences of his actions, it will not presume that he specifically intended any particular consequence. That is, a mere showing that certain conduct occurred which produced a particular result is legally sufficient to establish the actor's general intent.... [T]he bare fact of assaultive behavior will not give rise to a *presumption* that an assailant had the specific intent to cause any particular harm.... [S]pecific intent may be properly proved by reasonable *inferences* from the character of such acts and their surrounding circumstances. In particular, the specifics of a defendant's conduct and other circumstantial evidence may permit the jury to infer that he acted with the specific intent to cause bodily injury.

*Leavitt v. State*, 2011 WY 11, ¶ 10, 245 P.3d 831, 833 (Wyo. 2011) (internal citations omitted; emphasis in original).

[¶73] In *Walter*, while trying to resist arrest, the appellant drove his car directly toward a police officer. 811 P.2d at 718. The officer was able to jump out of the way, but suffered a pulled muscle in the process. *Id.* Appellant was charged with aggravated assault under § 6-2-502(a)(ii) (attempting to cause or intentionally or knowingly causing bodily injury to another with a deadly weapon). *Id.* On appeal, he argued that the State had not presented sufficient evidence of his intent because the only evidence was the officer's fear that appellant intended to hit him and that there was no corroborative evidence of specific intent because his behavior was consistent with his theory—that he was trying to avoid a collision with a patrol car parked at the intersection. *Id.* at 720. We rejected his argument, concluding that "[o]ne who knowingly drives an automobile directly at another person can reasonably be found to have intended to do bodily injury to that person." *Id.* at 721.

[¶74] Specific intent can be proven by reasonable inferences from the character of Mr. Sam's acts and their surrounding circumstances. The State presented evidence that Mr. Sam announced he was going to kill someone. He took a loaded firearm to the park where rival groups had agreed to meet. He was behind a cluster of trees and when

the group of teenagers appeared, he emerged from the trees and began firing in their direction, striking two of them. Taking these facts in the light most favorable to the State, there was sufficient evidence that a reasonable jury could infer that Mr. Sam acted with the intent to cause bodily injury to the members of the group of teenagers. One who knowingly fires a gun at a group of people can reasonably be found to have intended to do bodily injury to members of that group. *See People v. Perez*, 50 Cal.4th 222, 112 Cal.Rptr.3d 310, 234 P.3d 557, 559 (2010) ("The mental state required for attempted murder is the intent to kill *a* human being, not a *particular* human being." (citation omitted)); *State v. Brown*, 968 So.2d 766, 772 (La. Ct. App. 2007), *writ denied*, 978 So.2d 325 (2008) ("The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill."); *Medina v. State*, 7 S.W.3d 633, 637 (Tex. Crim. App. 1999) ("Opening fire with an automatic rifle, at close range, on a group of people supports the conclusion that appellant acted with the specific intent to kill."). There was sufficient evidence that Mr. Sam had the specific intent to harm the youths in the crowd into which he shot.

## V. Is the sentence imposed upon Mr. Sam excessive?

[¶75] Mr. Sam was sentenced to life, with the possibility of parole in 25 years, followed by three consecutive sets of concurrent sentences of 9 to 10 years. He presents three bases for his argument that his sentence was excessive. First, he argues that the cumulative sentences constitute a de facto life without parole sentence, in violation of the Eighth Amendment to the United States Constitution and *Graham v. Florida*, 560 U.S. 48, 74, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). Second, he contends that the cumulative sentences deprive the parole board of its statutory authority to consider parole of a juvenile after 25 years. Finally, he argues that his sentences for aggravated assault and murder of Tyler Burns violate his right

against double jeopardy.[7] We find that the sentence imposed does violate the Eighth Amendment, though for somewhat different reasons than those offered by Mr. Sam; that there is no statutory violation of the parole board's authority; and that Mr. Sam's double jeopardy rights are not violated.

## A. Mr. Sam's sentence violates the Eighth Amendment because it is a de facto life without parole sentence

[¶76] Mr. Sam argues that his consecutive sentences of a minimum of 52 years, with release possible when he is 70 years old, is unconstitutional. Issues of constitutionality present questions of law, which we review de novo. *Bear Cloud III*, 2014 WY 113, ¶ 13, 334 P.3d at 137.

[¶77] Mr. Sam contends that the proscriptions against sentencing a juvenile to life in prison for non-homicide offenses set forth in *Graham* should apply to him, because "[t]he charges of aggravated battery are clearly non-homicide offenses . . . ." *Graham* categorically barred "the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." 560 U.S. at 82, 130 S.Ct. at 2034. Unfortunately, Mr. Sam did commit homicide, and *Graham*'s categorical ban does not apply to him. Furthermore, Mr. Sam's attempt to unlink his sentences is contrary to our precedent. In *Bear Cloud III*, 2014 WY 113, ¶ 33, 334 P.3d at 141-42, we applied our constitutional analysis of sentence lengths to Mr. Bear Cloud's aggregate sentences, holding that "[t]o do otherwise would be to ignore the reality that lengthy aggregate sentences have the effect of mandating that a juvenile 'die in prison . . . .' " *Id.* (quoting *Miller*, 567 U.S. at 465, 132 S.Ct. at 2460). In *Sen III*, we declined the State's request that we overrule that conclusion. 2017 WY 30, ¶ 18 n.3, 390 P.3d at 775 n.3. In *Budder v. Addison*, 851 F.3d 1047, 1058 (10th Cir. 2017), the Tenth Circuit found there was clearly established law that states "may not take a single offense and slice it into multiple sub offenses in order to avoid *Graham*'s rule

that juvenile offenders who do not commit homicide may not be sentenced to life without the possibility of parole." Similarly, Mr. Sam may not slice his aggregate sentence into multiple sub offenses in order to apply a more lenient sentencing rule.

[¶78] The State correctly points out that there is not a categorical rule against life without parole sentences for juvenile homicide offenders. *Miller* "did bar life without parole, however, for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery v. Louisiana*, —— U.S. ——, 136 S.Ct. 718, 734, 193 L.Ed.2d 599 (2016). The *Miller* Court required sentencing courts to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Miller*, 567 U.S. at 480, 132 S.Ct. at 2469. That requirement has taken the form of a "*Miller* hearing," an individualized sentencing hearing during which the sentencing court obtains information to make the threshold determination whether the offender is one of "[t]hose who commit truly horrifying crimes as juveniles [and] may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives." *Graham*, 560 U.S. at 75, 130 S.Ct. at 2030; *see also Bear Cloud v. State*, 2013 WY 18, ¶ 42, 294 P.3d 36, 47 (Wyo. 2013) (*Bear Cloud II*) (setting forth non-exhaustive list of factors a sentencing court should consider in making *Miller* determination); *Bear Cloud III*, 2014 WY 113, ¶ 33, 334 P.3d at 142-42 (finding that same approach must be applied to aggregate sentences). The *Miller* Court advised that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Miller*, 567 U.S. at 479, 132 S.Ct. at 2469.

[¶79] Here, the district court held that Mr. Sam was not one of the rare juveniles who "should never have any possibility, 40, 50 years from now, of being granted parole." We first address the State's re-

---

7. We disposed of Mr. Sam's argument that no sentencing package for a juvenile should exceed 25 years in *Sen v. State*, 2017 WY 30, ¶ 21, 390 P.3d 769, 775 (Wyo. 2017) (*Sen III*), when we found "no indication that our legislature intend-ed for the 25-year period of parole ineligibility set forth in Wyo. Stat. Ann. § 6-10-301(c) to apply to aggregate sentences for multiple crimes."

peated contention that our only test in this instance should be one of proportionality— that is, *Miller* requires only the individualized sentencing hearing, and after the required determination has been made, the only limits on the sentence imposed are the limits for grossly disproportionate sentences set forth in *Solem v. Helm*, 463 U.S. 277, 292, 103 S.Ct. 3001, 3010-11, 77 L.Ed.2d 637 (1983). We rejected that argument in *Bear Cloud III*, we declined to revisit it in *Sen III*, and we continue to reject it.[8] The United States Supreme Court has clarified that *Miller* "did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of the 'distinctive attributes of youth.'" *Montgomery*, 136 S.Ct. at 734 (internal citation omitted). *Miller* requires more than a procedural checkmark before imposing a "sentence that would deny the juvenile offender a realistic opportunity of release in the offender's lifetime." *Budder*, 851 F.3d at 1055-56 (In juvenile non-homicide case, Tenth Circuit rejects semantic classifications that "would allow states to subvert the requirements of the Constitution by merely sentencing their offenders to terms of 100 years instead of 'life.').'" The United States Supreme Court clearly rejected the argument that *Miller* is merely procedural in *Montgomery*, where it held that *Miller* "announced a substantive rule of constitutional law," *Montgomery*, 136 S.Ct. at 736, and explained that the hearing required by *Miller* "does not replace but rather gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Id.* at 735. Because the district court has made the determination that Mr. Sam is not a juvenile so irredeemable that he deserves incarceration for the rest of his life, we turn to the question of whether the sentence imposed is a de facto life sentence that violates the strictures of *Miller* and *Bear Cloud III*.

[¶80] In *Bear Cloud III*, we analyzed the United States Supreme Court case law leading up to *Miller* and concluded that the

prohibition of life without parole sentences required a "'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" 2014 WY 113, ¶ 21, 334 P.3d at 139 (quoting *Graham*, 560 U.S. at 75, 130 S.Ct. at 2030). And we held that "[t]he prospect of geriatric release ... does not provide a meaningful opportunity to demonstrate the maturity and rehabilitation required to obtain release and reenter society as required by *Graham* ....'" *Bear Cloud III*, 2014 WY 113, ¶ 34, 334 P.3d at 142 (quoting *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013) (internal quotation marks omitted)). Since then, the United States Supreme Court has confirmed that the release for juveniles contemplated by the *Roper*, *Graham*, and *Miller* courts should allow them "hope for some years of life outside prison walls...." *Montgomery*, 136 S.Ct. at 736-37. We held in Mr. Bear Cloud's case that his sentence of a minimum of 45 years, with possible release when he is 61, was the functional equivalent of life without parole. *Bear Cloud III*, 2014 WY 113, ¶¶ 11, 33, 334 P.3d at 136, 142. In this case, the sentencing court has made the determination that Mr. Sam is not one of the juvenile offenders whose crime reflects irreparable corruption. An aggregated minimum sentence exceeding the 45/61 standard is the functional equivalent of life without parole and violates *Bear Cloud III* and *Miller* and its progeny. The sentence imposed on Mr. Sam of a minimum 52 years with possible release at age 70 clearly exceeds that. We therefore reverse and remand with instructions to the sentencing court to sentence Mr. Sam within the confines set forth in *Bear Cloud III*.

**B. The aggregate sentences do not deprive the parole board of its statutory authority to consider parole of a juvenile after 25 years**

[¶81] After the United States Supreme Court announced in *Miller* that the Eighth Amendment barred mandatory life without parole sentences for juvenile homicide offenders, the Wyoming Legislature amended the life imprisonment statute to say

---

8. This is not to say that proportionality cannot be part of our analysis of juvenile sentences; it is

only to say that we will not use it to abandon the ceiling set by *Miller*.

that persons sentenced to life imprisonment for an offense committed before the person reached 18 years of age "shall be eligible for parole ... after having served twenty-five (25) years of incarceration...." Wyo. Stat. Ann. § 6-10-301(c); 2013 Wyo. Sess. Laws ch. 18, § 1. Mr. Sam argues that this statute grants the board of parole authority to grant parole to juvenile offenders after 25 years of imprisonment, authority which the courts may not deprive the board of "by tacking numerous small sentences together in such a way as to defeat the remedial authority granted to the board." Mr. Sam contends that his position is bolstered by the language added at the same time to the parole board laws, 2013 Wyo. Sess. Laws ch. 18, § 1, which states that "[t]he board may also grant parole to a person serving a sentence for an offense committed before the person reached the age of eighteen (18) years of age as provided in W.S. 6-10-301(c)." Wyo. Stat. Ann. § 7-13-402(a) (LexisNexis 2017). The issue is one of statutory interpretation, which we review de novo. *State v. Mares*, 2014 WY 126, ¶ 23, 335 P.3d 487, 497 (Wyo. 2014).

[¶82] Mr. Sam's argument is simply a different variation of the argument that the 25-year period of parole ineligibility set forth in Wyo. Stat. Ann. § 6-10-301(c) should apply, no matter how many crimes the offender is convicted of, which we rejected in *Sen III*. *See supra* ¶ 75 n.7. The cited language in Wyo. Stat. Ann. § 7-13-402(a) refers specifically to persons serving a sentence under § 6-10-301(c); it does not contemplate or include reference to persons serving sentences for other crimes as well. We find no conflict in the statutes, and no infringement on the board of parole's statutory authority.

**C. Mr. Sam's sentences for both the murder and the aggravated assault of Tyler Burns do not violate the constitutional prohibition against double jeopardy**

██ [¶83] Mr. Sam was charged and convicted of both aggravated assault and battery and first-degree murder of Tyler Burns. The aggravated assault sentence is one of the sentences to be served consecutively, after the life sentence. In its closing argument, the State distinguished between the shot that injured Tyler Burns, the basis for the aggravated assault charge, and the shot that killed Tyler Burns—the basis for the murder charge.[9] Mr. Sam asserts that the two sentences violate his constitutional right against double jeopardy. U.S. Const. amend. 5, Wyo. Const. art. 1, § 11. We review constitutional claims de novo. *Anderson v. State*, 2014 WY 74, ¶ 17, 327 P.3d 89, 94 (Wyo. 2014).

██ [¶84] The double jeopardy clauses of the United States and Wyoming constitutions "provide protection against three distinct ills: a second prosecution for the same offense after one has been acquitted, a second prosecution for the same offense after one has been convicted, and multiple punishments for the same offense." *Solis v. State*, 2013 WY 152, ¶ 63, 315 P.3d 622, 636 (Wyo. 2013).

> However, such an analysis presupposes that the same conduct proved both offenses in issue. Thus, if the evidence showing one offense is separate and distinct from the evidence showing the other offense, then there is no need to analyze the similarity of the offenses or their lesser included quality, or to determine whether or not the legislature clearly intended to impose separate punishment for separate offenses originating from the same conduct.

*State v. Burlison*, 868 S.W.2d 713, 720 (Tenn. Crim. App. 1993) (citations omitted).

[¶85] The State contends that because the two charges were based on two different shots, these are two separate offenses, and double jeopardy is not implicated. Mr. Sam recognizes that "it would be theoretically possible" that the two shots constitute two crimes: "the first shot being an aggravated battery and the second shot being first degree murder." We find that the two charges are based on separate and distinct conduct, and therefore no double jeopardy issue is implicated.

---

9. The State argues that it made the same distinction at the jury instruction conference, but our reading of that transcript does not clearly support the contention.

### CONCLUSION

[¶86] The district court did not abuse its discretion when it denied Mr. Sam's motion to transfer the proceedings to juvenile court; we find some errors in the jury instructions, but they are not prejudicial either individually or cumulatively; the prosecutor's victim impact statements at closing were improper but not prejudicial; there was sufficient evidence to support the attempted assault and battery charges; the aggregate sentence does not deprive the parole board of its statutory authority; the sentence for murder and aggravated assault of the same victim does not violate double jeopardy. We affirm on all these issues. However, the aggregate sentence is a life without parole sentence which violates the strictures of *Miller* and *Bear Cloud III*. We therefore reverse and remand for resentencing in compliance with this decision.

FOX, Justice, delivers the opinion of the Court; Kautz, Justice, files a concurring in part and dissenting in part opinion.

KAUTZ, Justice, concurring in part and dissenting in part.

[¶87] I concur in the majority opinion with the exception of the majority's conclusion that [Mr. Sam's] "aggregate sentence is a life without parole sentence which violates the strictures of *Miller* and *Bear Cloud III.*" I dissent from that conclusion for the reasons set out in my special concurrence in *Sen v. State*, 2017 WY 30, ¶¶ 36-37, 390 P.3d 769, 779 (Wyo. 2017) (*Sen III* ).

[¶88] I believe this Court has gone beyond what is required by the U.S. Supreme Court and the Eighth Amendment to the U.S. Constitution when analyzing sentences imposed on defendants who (1) were appropriately tried in adult court; (2) were under the age of 18 at the time they committed the crimes for which they were sentenced; and (3) committed multiple crimes, including murder. No Supreme Court case addresses aggregate sentences for murder plus other violent crimes.

[¶89] The U.S. Supreme Court held that the imposition of a life without parole sentence on a defendant who committed crimes other than murder when under the age of 18 violates the Eighth Amendment's prohibition of excessive punishment. *Graham v. Florida*, 560 U.S. 48, 50-51, 130 S.Ct. 2011, 2017-18, 176 L.Ed.2d 825 (2010). It then directed that the imposition of mandatory life without parole sentences for defendants who committed murder before age 18 also violates the Eighth Amendment's prohibition of excessive punishment. *Miller v. Alabama*, 567 U.S. 460, 465, 132 S.Ct. 2455, 2461, 183 L.Ed.2d 407 (2012). These cases, and many others, recognize the "basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense." *Miller*, 567 U.S. at 469, 132 S.Ct. at 2463. Nothing in U.S. Supreme Court precedent indicates that the only factor to be considered in imposing a sentence on such a defendant is the potential for rehabilitation. Rather, the sentence must be proportional both to the offender's individual characteristics and to his crimes. The majority's approach, based on *Bear Cloud v. State*, 2014 WY 113, 334 P.3d 132 (Wyo. 2014) (*Bear Cloud III* ), treats all defendants who committed a crime or crimes before age 18 the same and creates nonproportional sentences. It permits juveniles, even though they are mature enough to be tried in adult court, to commit murder and many additional crimes without facing consequences for those additional crimes.

[¶90] The *Graham* and *Miller* decisions were based on the premise that juveniles who are being tried as adults are nevertheless constitutionally different from adults because the characteristics of youth render them less morally culpable. *Graham*, 560 U.S at 68, 130 S.Ct. at 2026-27; *Miller*, 567 U.S. at 472, 132 S.Ct. at 2465. In each of these cases, the U.S. Supreme Court required that the sentencing court consider a defendant's youth and potentially reduced culpability when determining a sentence. The trial court did just that for Mr. Sam. In *Graham*, the Supreme Court required states to provide juvenile non-homicide offenders with "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" *Graham*, 560 U.S. at 75, 130 S.Ct. at 2030, and in *Miller*, the Supreme Court ex-

tended that requirement to murderers unless the sentencing court finds that the defendant is "the rare juvenile offender whose crime reflects irreparable corruption." *Miller*, 567 U.S. at 479-80, 132 S.Ct. at 2469. (The facts in Mr. Sam's case could have supported such a finding.) The trial court also did that for Mr. Sam. Mr. Sam did not act from impulse, immaturity, or at the invitation or inducement of others. He intentionally prepared for his crimes, baited the victims into an ambush, committed multiple aggravated assaults on numerous victims, and culminated the spree with an execution-style murder. Proportionality requires that those factors be considered in his sentence, as well as the remote possibility of rehabilitation.

[¶91] The U.S. Supreme Court has not defined a "meaningful opportunity to obtain release." Nothing in any Supreme Court decision suggests that a "meaningful opportunity to obtain release" must be the same for every defendant. To the contrary, the proportionality required by the Eighth Amendment indicates that a more mature defendant who commits multiple crimes including murder should receive a lengthier sentence than someone who is less mature or commits only one crime.

[¶92] In this case, the district court did all it was required to do in sentencing Mr. Sam. It conducted a thorough individualized sentencing hearing and considered multiple times Mr. Sam's youthful factors, family history, and participation in the crime as required by *Miller* and *Bear Cloud III*. It crafted a sentence it felt was appropriate based upon all of these factors, and it believed this sentence did not constitute a *de facto* life sentence. It concluded that Mr. Sam deserved a longer sentence than if he had only committed the murder, or the murder and one additional aggravated assault.

[¶93] The majority remands this case to the district court to impose an aggregate sentence of something less than the 45 years that was rejected in *Bear Cloud III*, concluding that Mr. Sam's sentence denies him any meaningful opportunity for release before he is "geriatric." I disagree. If Mr. Sam is motivated by the possibility of parole and comports himself well while in prison he will receive credit for "good time" under Wyo. Stat. Ann. § 7-13-420 (LexisNexis 2017) and Department of Corrections rules. He will then be eligible for parole on the last of his sentences at about age 61. I do not agree that release at that age deprives Mr. Sam of all meaningful portions of life.